368 A.2d 635

**COMMONWEALTH of Pennsylvania, ex rel. William M. SPRIGGS, Jr., Appellant,**

**v.**

**Glenda L. CARSON.**

Supreme Court of Pennsylvania.

Argued May 5, 1975.

Decided Jan. 28, 1977.

292

---

Nevin Stetler, Stetler & Gribbin, York, for appellant.
J. Ross McGinnis, York, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

NIX, Justice.

This appeal concerns the custody of a nine year old boy, Jeffrey Scott Spriggs. Following an extensive hearing, the Court of Common Pleas of York County determined that the child's best interests would be served by awarding custody of Jeffrey to his father. The Superior Court, with two judges dissenting,[1] undertook its own review of the record and reversed the trial court's determination, awarding custody to the mother. This Court subsequently granted the appellant father's petition for allocatur.[2] Because we believe the Superior Court ex-

---

1. *Commonwealth ex rel. Spriggs v. Carson*, 229 Pa.Super. 9, 323 A.2d 273 (1974). Judge Price filed a dissenting opinion which was joined by Judge Spaeth. Judge Hoffman did not participate in the consideration or decision of the case.

2. *See* Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, art. II, § 204(a), 17 P.S. § 211.204(a) (Supp.1976).

ceeded its proper scope of review in this matter, we reverse and reinstate the trial court's order.

The pertinent facts disclose that Jeffrey's parents were married in 1964. Jeffrey's sister, Christine Denise Spriggs, now eleven years old and in the custody of the father, was born on September 13, 1965. Jeffrey was born on September 1, 1967. Jeffrey's mother, now Mrs. Carson and appellee herein, was stricken in 1968 with a severe mental depressive condition which caused her on several occasions to threaten to take her life. As a result, in February 1970, the parties separated and the children remained with the father while the mother freely visited them. This arrangement, in view of the mother's debilitating illness and financial situation was conceded by both parties to be in the best interests of the children. The parties were divorced in June 1970, and in February 1971, Mrs. Carson married her present husband.

On March 5, 1971, Mrs. Carson picked up the children for a weekend visit and refused to return them, advising the father that she would not permit him to take the children from her home unless he entered into a written agreement giving her custody. On March 9, 1971, the father forcibly took the children from the mother and drove with them to Florida, where he resided with the children in his parents' home. In May 1971, after learning of the children's whereabouts, the mother went to Florida and instituted custody proceedings. A hearing attended by all parties was held before the Florida Court on February 1, 1972, and the judge issued a temporary order awarding custody to the father. The order contained a provision granting liberal visitation rights to the mother while she was in Florida and in Pennsylvania over the summer. The order further provided for a final hearing after the summer visitation.

On February 3, 1972, the mother, in violation of the Florida Court's order, left that state with Jeffrey, and

the Florida Court entered a decree holding her in contempt. Thereafter, the mother moved with Jeffrey back to York County, to her mother's home in Indiana County, then to Ohio, and finally to Lancaster County in order to avoid service of process in the present action, which was instituted by the father in February, 1972. As a result, service was not accomplished until October, 1973. Thereafter, on November 8, 1973, the hearing court below entered its order awarding custody to the father.

In reversing the lower court's determination, the Superior Court stated that too much emphasis had been placed by the lower court on the mother's extra-legal efforts to gain custody of Jeffrey, in light of the father "equally rash conduct" in taking the children to Florida, concluding instead that the determination should have focused on "the present situation as it exists and as it relates to the best interest of the children." 229 Pa.Super. at 14, 323 A.2d at 275. The court thereupon conducted its own review of the record to find that at the time of the hearing, the mother was a full time homemaker in an established, happy and well coordinated home, who had been restored to good health, and who was attentive to Jeffrey's needs. On this basis, the Superior Court determined that the custody of Jeffrey should have been awarded to the mother.

Appellant urges on this appeal that the Superior Court exceeded its proper scope of review in reversing the finding of the trial court, contending that the reviewing court intruded upon the fact-finding function of the hearing judge. We agree, and for the reasons discussed below, reverse the order of the Superior Court and reinstate the order of the hearing judge awarding custody of Jeffrey to the father.

■■ It is now beyond dispute that the sole issue to be decided in a custody proceeding between contending parents is the best interests and welfare of the child. Act of June 26, 1895, P.L. 316, § 2, 48 P.S. § 92 (1965);

*Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976); *Commonwealth ex rel. Holschuh v. Holland-Moritz,* 448 Pa. 437, 292 A.2d 380 (1972); *Commonwealth ex rel. v. Daven,* 298 Pa. 416, 148 A. 524 (1930). In order to insure such a focus, our law has long recognized that the scope of review of an appellate court reviewing a custody matter is of the broadest type. *Commonwealth ex rel. Holschuh v. Holland-Moritz, supra; Davidyan v. Davidyan,* 230 Pa.Super. 599, 327 A.2d 145 (1974). Thus, an appellate court is not bound by deductions or inferences made by a trial court from the facts found; *Commonwealth ex rel. Bowser v. Bowser,* 224 Pa.Super. 1, 302 A.2d 450 (1973), nor must a reviewing court accept a finding which has no competent evidence to support it; *Commonwealth ex rel. Ulmer v. Ulmer,* 231 Pa.Super. 144, 331 A.2d 665 (1974).

However, we have also taken great care to stress:

". . . [T]his broader power of review was never intended to mean that an appellate court is free to nullify the fact-finding function of the hearing judge. It is a principle which runs through all our cases that the credibility of witnesses and the weight to be given to their testimony by reason of their character, intelligence, and knowledge of the subject can best be determined by the judge before whom they appear." *Commonwealth ex rel. Harry v. Eastridge,* 374 Pa. 172, 177, 97 A.2d 350, 353 (1953) (citations omitted).

This fundamental limitation of a reviewing court's power has been articulated by the Superior Court as well in defining its own scope of review in custody matters:

". . . [W]e have recognized that the trial judge is in a position to evaluate the attitudes, sincerity, credibility, and demeanor of the witness. Because we are not in such a position, we have recognized that a trial judge's determination of custody should be accorded great weight. Only where we are constrained to hold that there was a gross abuse of discretion

should an appellate court interfere with the decisions of the hearing judge." *Commonwealth ex rel. Rainford v. Cirillo*, 222 Pa.Super. 591, 597–98, 296 A.2d 838, 841 (1972).

■ The appellee agrees that the Superior Court is not free to nullify the fact-finding function of the hearing judge, but contends that in this case the Superior Court remained within the proper bounds of its review and based its reversal upon its own independent deductions and inferences from the facts as found by the hearing judge.

It should first be noted that while the hearing judge did express concern over the mother's activities occurring prior to the date of the hearing, it is clear that the crux of his analysis was in fact directed to the overall fitness of the contending parents at the time of the hearing. There was ample testimony to support the finding that either parent was fully capable of providing for the child's physical well-being. Indeed, the hearing judge stated that "the father impressed us as a quiet, sincere person, who is deeply attached to his children and interested in their well-being. He also can offer this child all of the physical advantages." As to the mother, the trial judge noted that "she is intelligent, enormously concerned with the welfare of this child, and presently able to provide fully for his daily care and well-being." There is no dispute therefore on the basis of the testimony that both parents were fit to have custody.

The decision of the hearing judge thus depended largely upon a determination of the character and weight to be afforded the testimony offered by the competing parents. In this respect, we quote extensively from the trial judge's opinion as follows:

The most disturbing factor affecting an award of custody to the mother is our conclusion, as testimony developed, that this mother would do anything and say

anything to gain custody. To some this may be construed as evidence of all-conquering love. To this Court, it indicates amorality. We are convinced that the Respondent has been less than candid in many respects. Our first indication was her reaction to the Florida proceeding. When recounting it in Court, she purported to break down and sob at the very recollection of a horrible one-sided kangaroo proceeding. As we read the record, the Florida Court took an entire day in an effort to work out a constructive and temporary solution. The Judge heard a number of witnesses, including three called by Respondent's counsel. He obviously reached the conclusion that whatever the cause, a severe rupture in the relationship between the mother and her two children had occurred. In what appears to us to be an effort to restore that relationship, and probably to then award custody of one or both children to the mother the Judge adopted a temporary approach insisting upon abundant visitation. Remembering that the Respondent is intelligent, we are forced to conclude that she is emotionally unsound on this subject, or is deliberately misrepresenting the situation in an attempt to justify her conduct in abducting and hiding the child. Another example is her testimony that visitation with the daughter went smoothly, and that there was no indication that the child was upset until the mother stated that it was time to take her home. All parties agreed that the mother brought the daughter home early. Since she had not seen the child for a long time, had to do a great deal of driving, and had only obtained the child a few hours before such return, this early return suggests that the testimony of the father and paternal grandmother more accurately reflected the facts. Along this line, we believe the paternal grandmother when she testified that the mother understood Christine's reluctance to go with her the following day,

and that she did not vigorously press for visitation. The mother would have us believe that she took her son and fled out of frustration over her inability to visit her daughter, and that she did not believe that the Florida Court could or would do anything about this. This is hard to believe, given the attitude of the Florida Judge when he established such visitation the preceding day. A final example is the testimony of the mother on cross-examination that she was receiving benefits from Social Security for total physical disability, which contradicted her prior testimony as to her physical fitness. We note in this regard that she had not advised either doctor that she called before this Court of any such disability. Perhaps more important than the significance of this contradiction was the effect that it had upon the Respondent in Court. She changed from a confident, alert witness, adroitly fencing with opposing counsel to a highly distressed state, consistent with Dr. Pandelidis' description of a "colitis person".

It seems clear that while the hearing judge did indicate that certain pre-hearing conduct was a factor to be considered, his determination was based largely upon his subjective perceptions of the witnesses and the credence he was willing to attribute to their testimony at the time of the hearing. He alone had the opportunity to see and hear the witnesses in this case, and therefore had the better opportunity to pass upon their demeanor and character. These are qualities which cannot be divined from the mechanistic reading of a cold record. It is these factors which must therefore be accorded great weight by a reviewing court.

■ Judge Price, dissenting in the Superior Court in an opinion joined by Judge Spaeth, also expressed these views, noting in particular that not one but two judges

who heard the witnesses in this matter had reached the same conclusion as to custody:

> I am also concerned and give consideration to the fact that two very able judges have considered the problem herein presented and both have reached the same conclusion, that is, that the best interests of this child are served by awarding custody to the father.
>
> .    .    .    .    .    .    .    .
>
> While it is our duty to examine the evidence in custody cases, we are not free to nullify the fact-finding function of the hearing judge, who can best determine the credibility and the weight to be given to the testimony of the witnesses who appear before him.

229 Pa.Super. at 19–20, 323 A.2d at 277–78.

We share with Judge Price the view that the majority in the Superior Court failed to give the proper weight due to the opinions of the judges who heard the witnesses in this case.

Finally, we note that in reaching its conclusion that custody should be awarded to the mother, the majority in the Superior Court relied heavily upon the "tender years doctrine" and the rule of preference to a resident guardian over a non-resident guardian. The latter principle was obviously more tenable in the days of a less mobile society. In today's accessible and communicative world the validity of this proposition is open to serious question. It would be presumptive to believe that the care and concern of the Pennsylvania Courts for the best interest and the welfare of a child is not shared by our sister States. To the contrary, the thoroughness and the interest exhibited in this case by the Florida Court demonstrates the fallacy of this argument.

■■ We also question the legitimacy of a doctrine that is predicated upon traditional or stereotypic roles of men and women in a marital union. Whether the tender years doctrine is employed to create a presumption which

requires the male parent to overcome its effect by presenting compelling contrary evidence of a particular nature; *Commonwealth ex rel. Lucas v. Kreischer*, 450 Pa. 352, 299 A.2d 243 (1973); *Commonwealth ex rel. Logue v. Logue*, 194 Pa.Super. 210, 166 A.2d 60 (1960), or merely as a makeshift where the scales are relatively balanced; *Commonwealth ex rel. Parikh v. Parikh*, 449 Pa. 105, 296 A.2d 625 (1972); *Commonwealth ex rel. Veihdeffer v. Veihdeffer*, 235 Pa.Super. 447, 344 A.2d 613 (1975), such a view is offensive to the concept of the equality of the sexes which we have embraced as a constitutional principle within this jurisdiction. *See* Pa. Const., art. I, § 28; *Conway v. Dana*, 456 Pa. 536, 318 A.2d 324 (1974). Courts should be wary of deciding matters as sensitive as questions of custody by the invocation of "presumptions". Instead, we believe that our courts should inquire into the circumstances and relationships of all the parties involved and reach a determination based solely upon the facts of the case then before the Court.

Order of the Superior Court reversed and the Order of the Court of Common Pleas reinstated.

MANDERINO, J., did not participate in the consideration or decision of this case.

JONES, C. J., and EAGEN, and POMEROY, JJ., concur in the result.