381 A.2d 173

**COMMONWEALTH of Pennsylvania ex rel. Yvonne L. SCOTT, Appellant,**

v.

**Boyd Lee MARTIN.**

Superior Court of Pennsylvania.

Argued June 14, 1977.

Decided Dec. 2, 1977.

R. Gerber, Norristown, with him Michael C. Shields, Norristown, for appellant.

Vincent A. Couchara, Norristown, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

OPINION PER CURIAM:

Order vacated. The case is remanded to the court below for proceedings in conformity with the opinions in support of remand filed herewith in this case.

HOFFMAN and PRICE, JJ., file opinions in support of per curiam order.

SPAETH, J., files opinion in support of per curiam order in which CERCONE, J., joins.

JACOBS, J., files a dissenting opinion in which WATKINS, President Judge, and VAN der VOORT, J., join.

HOFFMAN, Judge, in support of per curiam order:

I agree with Judges PRICE and SPAETH that the mother of an illegitimate child does not have a greater right to custody of that child than its natural father. Instead, custody must be awarded solely according to what the preponderance of the evidence shows will be in the child's best interests. In the instant case, I believe that a remand is necessary in order to ascertain the best interests of the child. Because appellant's stability is a serious issue in the case, the lower court, in its discretion, should consider whether psychological and neuropsychiatric examinations of all concerned, including the child, might be of value in determining the best interests of the child. Additionally, there was a final hearing on this case more than one year ago. In a custody case in which multiple factors can intervene to change the relative position of the parties, pragmatics and justice demand a re-evaluation of the situation. I would remand, therefore, to the lower court for the purpose of a reappraisal consistent with this opinion.

PRICE, Judge, in support of per curiam order:

In my opinion the primary issue is whether a lower court may award custody of an illegitimate child to his natural father on the basis of a finding that the child's best interests would be served by such an award but without a further finding that the mother is unfit to care for the child. *See, e. g., Commonwealth ex rel. Gifford v. Miller,* 213 Pa.Super. 269, 248 A.2d 63 (1968); *Commonwealth ex rel. Logue v. Logue,* 194 Pa.Super. 210, 166 A.2d 60 (1960); *Commonwealth ex rel. Kevitch v. McCue,* 165 Pa.Super. 49, 67 A.2d 582 (1945).

Heretofore, "[t]he general rule . . . has been that the right of a mother to the custody of an illegitimate child is superior to that of all other persons, including [its] father . . . ." *Commonwealth ex rel. Kevitch v. McCue, supra* 165 Pa.Super. at 51, 67 A.2d at 583; *accord Commonwealth ex rel. Gifford v. Miller, supra.* This rule is based on the belief that "ordinarily the best interests of the child can be served by maternal care." *Commonwealth ex rel. Kevitch v. McCue, supra* 165 Pa.Super. at 51, 67 A.2d at 583.[1]

It is well established that "the sole issue to be decided in a custody proceeding between contending parents is the best interest and welfare of the child." *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 294, 368 A.2d 635, 637 (1977), *quoting Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976); *see also Gwiszcz Appeal,* 206 Pa.Super. 397, 213 A.2d 155 (1965). The inquiry should be the same whether or not the father was married to the mother. If we require a natural father, who is better

1. The court in *Kevitch* concluded that an illegitimate child is not legally related to his father. It is true that under our Probate, Estates and Fiduciaries Code, 20 Pa.C.S. § 101 *et seq.,* an illegitimate is not an heir of his father for the purpose of intestate succession. On the other hand, the father of an illegitimate is obligated to support the child. *See* 18 Pa.C.S. § 4323 (Neglect to support bastard). Obviously, father and child are related for support purposes. I do not believe that our system of intestate succession is dispositive of, or even relevant to, custody cases. The sole issue is, or should be, the child's best interests whether or not he is considered legally related to his father.

able to insure the child's welfare, to prove that the mother is an unfit person to be entrusted with the child before he may be awarded custody, we are, in effect, punishing the child for his illegitimate status. Irrespective of constitutional implications, we would be casting aside what has been termed an indisputable rule of law by awarding custody to the parent less able to care for the child.

In my opinion, the principle involved in this case is based on the same philosophical considerations as the tender years doctrine. As to the latter, our supreme court, in *Commonwealth ex rel. Spriggs v. Carson, supra,* stated the following:

"We also question the legitimacy of a doctrine that is predicated upon traditional or stereotypic roles of men and women in a marital union. Whether the tender years doctrine is employed to create a presumption which requires the male parent to overcome its effect by presenting compelling contrary evidence of a particular nature; [citations omitted], or merely a makeshift where the scales are relatively balanced; [citations omitted], such a view is offensive to the concept of the equality of the sexes which we have embraced as a constitutional principle within this jurisdiction. [Citations omitted]. *Courts should be wary of deciding matters as sensitive as questions of custody by the invocation of 'presumptions.' Instead, we believe that our courts should inquire into the circumstances and relationships of all the parties involved and reach a determination based solely upon the facts of the case then before the Court."* 470 Pa. at 299, 368 A.2d at 639–40 (emphasis added).

*Commonwealth ex rel. Spriggs v. Carson, supra,* involved a dispute between divorced parents. I perceive no reason to distinguish the instant case on this basis. I would, therefore, repudiate any intimation in our prior cases that a natural father must prove the mother unfit in addition to the fact that he is able to provide for the child's best interests.

In the instant case, the lower court found that the child's best interests would be served by placing him in his

father's custody. This decision was based primarily on a finding (1) that the mother was emotionally unstable and (2) that the child was being raised as much by babysitters as by the mother. I agree that the record supports the lower court's first finding; however, based on *Commonwealth ex rel. Logue v. Logue,* 194 Pa.Super. 210, 166 A.2d 60 (1960), I believe that the latter finding was improper. Because it is impossible to determine how much weight was accorded, by the lower court, to each finding, I would remand this case for further proceedings.

An appellate court is not bound by deductions or inferences made by a trial court from the facts found. Likewise, an appellate court need not accept a finding which has no competent evidence to support it. *Commonwealth ex rel. Ulmer v. Ulmer,* 231 Pa.Super. 144, 331 A.2d 665 (1974); *Commonwealth ex rel. Bowser v. Bowser,* 224 Pa.Super. 1, 302 A.2d 450 (1973). However, our courts have recognized that "the trial judge is in a position to evaluate the attitudes, sincerity, credibility, and demeanor of the witness. . . . [Therefore,] a trial judge's determination of custody should be accorded great weight. Only where we are constrained to hold that there was a gross abuse of discretion should an appellate court interfere with the decisions of the hearing judge." *Commonwealth ex rel. Spriggs v. Carson, supra,* 470 Pa. at 295, 368 A.2d at 637, *quoting Commonwealth ex rel. Rainford v. Cirillo,* 222 Pa.Super. 591, 597--98, 296 A.2d 838, 841 (1972).

As I read the record, the proper disposition of the instant case turned on the question of credibility.[2] The lower court found, based on three particular episodes, that appellant was emotionally unstable. The dissent would find, *on the basis of appellant's testimony,* that (1) appellant acted in the child's best interests when she "temporarily relinquished custody of the child due to acute financial problems and inability to obtain a babysitter" and (2) the lower court

---

2. I agree completely with Judge Spaeth's recitation of the facts of record. I do not agree, however, that we can affirm on the record now before us.

"overlooked the obvious fact that appellant's financial predicament was due in part to appellee's failure to assume any obligation to support the child." (Dissenting op. at 202).

First, appellee testified that in January and June of 1975, he offered financial assistance but appellant refused to accept it. In February of 1975, appellee enlisted in the armed services. He testified that during most of the one year period that he was in the service, he did not know appellant's address and, therefore, could not mail a support allotment to her. Appellant moved several times, and appellee's assertion that he did not know appellant's address is supported by the record. There certainly is no indication that appellant ever requested financial support or informed appellee of her various addresses.[3]

Moreover, appellee and his parents testified that on the three occasions in question, appellant telephoned, at odd hours, and demanded that they come immediately and pick up the child. According to appellee's witness, appellant was intoxicated during two of the episodes.[4] The first time she called, in January of 1975, appellant exclaimed that because of excessive drinking and depression, she could no longer cope with the child. At no time did appellant inform appellee or his parents that the transfers were temporary or that they were necessitated by financial problems.

It is true that "[a] parent may . . . fulfill parental duties and provide for a child by making suitable arrangements for the child's temporary care, *Wolfe Adoption Case,* 454 Pa. 550, 557, 312 A.2d 793, 796–97 (1973), or by allowing others to provide essential parental services during a period of crisis. See *In re: Involuntary Termination of Parental Rights to S.M.D.,* 40 Northampton County Rptr. 83, 87 (Pa.C.P. 1971)." *Appeal of Dine B.,* 456 Pa. 429, 434, 321 A.2d 618, 620 (1974). In the instant case, however, the lower

3. Appellee also testified that after his discharge in 1976, he telephoned appellant and attempted to obtain visitation privileges. Appellant refused his request.

4. Appellant testified that she had never been intoxicated in the child's presence.

court was fully justified in finding that appellant suffered from a basic emotional flaw rather than a lack of assistance in providing essential parental services.

Additionally, the dissent would find that "the circumstances underlying these episodes no longer exist and therefore are not relevant to this analysis."[5] (Dissenting op. at 202). This assertion again accepts as true the appellant's version of the facts. It is obvious that the lower court did not believe her. Moreover, the lower court found a pattern of behavior which in its opinion demonstrated basic instability. The January, 1975, incident is a relevant part of this pattern of behavior, even though in other circumstances it might be considered somewhat remote in time.

Finally, it should be noted that the lower court also considered the child's social adjustment in his father's home. Appellee lives with his current wife and her seven year old son. When Boyd, Jr., arrived in their home he was somewhat of a behavioral problem. Based on competent evidence, the lower court found that the child has adapted well to his new home. Mrs. Martin testified that she loves the child and supports her husband's desire for custody. There was substantial testimony that Mrs. Martin's son and Boyd, Jr., play together and enjoy each other's company.

Based on the foregoing discussion, I would vacate the order of the lower court and remand this case for further proceedings and evaluation in accordance with this opinion.

SPAETH, Judge, in support of per curiam order:

The division of this court, as manifested by the ensuing opinions, creates a procedural difficulty that requires some comment.

Three judges (JACOBS, J., joined by WATKINS, P. J., and VAN der VOORT, J.), would reverse the order of the hearing judge and award custody of the child to the mother.

5. The dissent cites appellee's testimony concerning appellant's prior use of barbiturates in support of its argument. There is absolutely no indication on the record that the lower court relied on this testimony.

That disposition cannot be adopted because the remaining four judges of the court are agreed that certain of the cases relied upon by counsel for the mother should be overruled, and that custody of the child should not be awarded to the mother, at least not by this court and without any further proceedings. The procedural difficulty arises because of these four judges, two (SPAETH, J., joined by CERCONE, J.) would affirm the order of the hearing judge awarding custody to the father, and two (HOFFMAN, J., and PRICE, J., in separate opinions) would remand for further hearing.

If this division were to remain, a majority of the court would not have agreed upon a result. In these circumstances Judge CERCONE and I agree that the case should be remanded so that the hearing judge may reconsider his decision in two respects: First, for the reasons stated by Judge HOFFMAN, the judge should consider the desirability of ordering psychiatric or psychological examinations of the father, mother, and child; if he decides upon such examinations, he should conduct such further proceedings as appropriate. Second, for the reasons stated by Judge PRICE, and regardless of the decision regarding psychiatric or psychological examinations, the judge should reconsider his decision, bearing in mind that the mother is not to be penalized because of her use of babysitters. Following the judge's decision on these matters, he should file a new order, with an explanatory opinion, after which either party may again appeal.

The dissenting opinion's conclusion that the order of the hearing judge should be reversed depends upon two premises: First, the dissenting opinion says, "we are not bound by a finding which has no competent evidence to support it." Dissenting opinion at 200 (citing cases). Second, the dissenting opinion says:

Here the record fails to bear out the trial judge's conclusion that appellant [the mother] suffers from a basic instability which is harmful to the child's emotional welfare. To the contrary, testimony in the court below clearly indicates that the mother leads a stable life and

can provide a healthy and normal environment in which to raise her child.

*Id.*

With the first premise, of course, I agree; no one could not. With the second premise, however, I vigorously disagree. The "testimony in the court below clearly indicates that the mother *does not lead* a stable life and *cannot provide* a healthy and normal environment in which to raise her child."

-1-

As the dissenting opinion acknowledges, the hearing judge found that the mother is so basically instable that it would be better for the child to be in his father's custody. Contrary to the dissenting opinion's statement, however, there is a great deal of competent evidence in support of this finding. This evidence particularly concerned three critical episodes—the last of which occurred only a bit more than a month before the hearing. It will be useful before describing these episodes to discuss their background.

-a-

The mother and father of the child were never married to one another. The mother is now twenty three or twenty four years old (N.T. 16), and we may assume that the father is about the same. The record does not disclose when the mother and father started living together; however, they met in 1972 (N.T. 107), and apparently were together in Baltimore County, Maryland, on July 7, 1974, when their child, a boy, was born (N.T. 2). About this time—the date is uncertain (N.T. 46–47)—the mother's stepfather got the father a job as a salesman selling business forms; the job was with the same company for which the stepfather worked.

Incident to this job the father was sent from Maryland to Fort Washington, Pennsylvania, for a training course. (N.T. 92) The relationship between the mother and father was already troubled, evidently in part because of the mother's

failure to pay the bills and also because of her drinking (the father testified that she was "drunk . . . maybe two or three days a week", N.T. 93).[1] We do not know to what extent the father's conduct may have contributed to this situation, except the record does disclose that while in Fort Washington he had an affair with another woman, as a result of which he and the child's mother separated in November, 1974. (N.T. 95)

The mother remained with the child in Maryland. The father finished the training course, but in December the stepfather forced him to resign, and he went to live in Roslyn, Pennsylvania. (N.T. 95–96) In February, 1975, he entered the Army (N.T. 99), and in March (or about then— the exact date does not appear), he married the woman with whom he had had the affair. (N.T. 91, 95) She has a son by a prior marriage, who is evidently about seven years old, since at the time of the hearing he was in first grade. (N.T. 123) The father was sent by the Army to Oklahoma and then Colorado, and was honorably discharged in April, 1976. (N.T. 100, 107) He resumed living in Roslyn, with his wife and her son in a two-bedroom town house. (N.T. 105, 123) As of the date of the hearing, in October 1976, his wife was employed during the evenings (N.T. 123), and he was receiving V.A. benefits (N.T. 91) and attending technical school studying to be an electrician (N.T. 106–114), with the expectation of graduating in May, 1977 (N.T. 117).

The record is less clear as to the mother's movements, but it is sufficient; the details are not important.

After the mother and father separated, in November, 1974, the mother and child went to live with the child's father's parents in Odington, Maryland. (N.T. 22, 59, 62) The arrangement proved unhappy, apparently because the mother ran up a telephone bill, drove the car without a license, and declined to take a job that had been found for

1. The mother denied drinking on a regular basis (N.T. 39) (*but see* N.T. 129: when asked whether she got intoxicated at parties, she replied, "Not at every party, no"). The hearing judge's resolution of such issues of credibility will be discussed later in this opinion.

her. (N.T. 62–64) After about a month (N.T. 62), she went with the child to live with her mother and stepfather, in Waldorf, Maryland. (N.T. 26, 44) Again, however, because of "financial problems" (N.T. 24, 131), she was asked to leave—apparently after only a brief stay.

Next the mother lived with a couple that offered to help her get back on her feet. (N.T. 25, 68) Then she got an apartment, which she shared, and then an apartment of her own, from which she and the child were evicted in June, 1976. (N.T. 30, 31) At some point she lived with an aunt in Bowie, Maryland, for about a month (N.T. 30), and when her aunt moved, with a friend for about a week (N.T. 30), then she got a one-bedroom apartment in Adelphi, Maryland, where she and the child were living at the time of the hearing (N.T. 3, 5, 31).

From November, 1974, until February or March, 1975, the mother lived on her welfare checks. (N.T. 27) Since then she has been continuously employed, except for a period of one month when she changed from her first job, as a travel agent, to a job with a law firm in Rockville, Maryland; at the time of the hearing she had been at the law firm for about one year. (N.T. 38) While she worked, another woman, who lived in the same apartment project, cared for the child. (N.T. 6, 39)

-b-

It is now in order to discuss the three episodes that persuaded the hearing judge that the mother was too instable to provide proper care for the child.

The first episode occurred in January, 1975—about two months after the mother and father had separated. The mother had been asked by her mother and stepfather to leave them. Discovering where the father was living in Pennsylvania, she went with the child to a Holiday Inn in Philadelphia, got a room, and called the father at 2:00 a. m. She testified that she told the father, "You're going to have to take care of us, I can't do it." (N.T. 24) The father testified that he and his wife-to-be went to the Inn; that

there the mother handed him the child, wrapped only in a towel and a sweater and with no clothes; and that she told him she was depressed and had been drinking, "the child being around was getting too much for her," and "[s]he couldn't cope with it." (N.T. 96–97) The father also testified that he asked the mother

> if she would stay up here in Pennsylvania and let me help her out, get her an apartment. She would be close to me and I could see the child, I could take care of her and stuff like that, but she said, no, she wanted to go back, that she had a good job waiting for her, or one lined up because she had friends back there to help her.
>
> (N.T. 97–98)

About four or five days later the mother called the father and asked him to drive the child back to Maryland and to leave him at the father's parents' home, which the father did; when he arrived at his parents' home the mother was not there. (N.T. 98–99)

The second episode occurred in June, 1976. The mother had been subletting an apartment for a few weeks. (N.T. 19) When the original tenant returned and asked that she and the child leave (*id.*), she called the child's father's father who described what happened as follows:

> A. One night about ten o'clock on a Friday evening I think she called me, Yvonne called me. She said, "Do you want the baby?" I said, "Well, what do you mean?" She said, "Do you want to come down and get the baby?"
>
> I said, "Wait a minute, we've got plans for this weekend," and I turned around and I—was going to ask her and she said, "If you don't come down and get him he's going to be on the street in thirty minutes."
>
> Q. She said that?
>
> A. Yeah. Yvonne said this. I said, "Well, wait a minute, Yvonne, I'm coming down to get him, but it takes me at least thirty minutes to get there. Give me a chance to get down there." I drove down to the apartment and I didn't see her outside. I went in there and pushed the intercom system, right? And I believe the apartment was

703, it was on the 7th floor. Well, the guy that answered, I could hear him but he couldn't hear me, see? It was out of order or something like that. So my wife and I went up on the elevator, we met this guy in the hall. And he said, "Who are you looking for?" I said, "Looking for Yvonne Scott." And he said, "Well, she's not here," he said, "she left with the baby and went outside someplace. She's been drinking all day," and he said, "I can't live with that woman."

I said, "I'm not interested in that, I want to get her and take the baby up." So my wife and I went back downstairs. The driveway in the apartment has a circular complex, right?

Q. Right.

A. Can I have a drink of water here? My mouth's getting dry?

(The witness was given a glass of water.)

THE WITNESS: So we went back outside back on the circular drive and there was Yvonne walking across the front, the sidewalk. I hollered three times at her, and she didn't let on like she even heard me. I run around the circle and got in front of her and walked up to her. And when she come up to me she said, "Here, take him," and thrown a diaper bag off her shoulder and gave him to me, gave it to me.

I got her by the arm and said, "Come on, Yvonne, come over by the car. We want to talk to you." And she broke loose and said, "I'm not going anyplace," and took off. Well, the baby was screaming and hollering at that time so we went to the car and tried to get him calmed down. We got him calmed down a little bit and then I drove around the parking lot for, oh it must have been ten minutes because there's a parking lot, I guess, about three sides of the building; in and around the roads looking for her.

BY MR. COUCHARA:

Q. This was in June; right?

A. This was in June, this year, right. And we couldn't find her. I went out to the entrance of the apartment complex and drive down the road each way, you know, to see if she was walking along the road, and I couldn't find her. So where she went, I don't know.

N.T. 71–73.

At the end of this testimony, after cross-examination, the father's father responded to a question by the hearing judge, as follows:

BY THE COURT:

Q. Mr. Martin, the incident in June of this year when you went down and ultimately found Yvonne somewhere about the apartment complex, what if any observations did you make as to her condition at that point.

A. Well, to be quite frank, Your Honor, my wife and I thought she was either drunk or under dope. We discussed this when we got back home.

N.T. 89–90.

For the first few days after the father's parents got the child, the child "would throw some fits that you couldn't hardly cope with", but "after he was there for a few days he seemed to calm down." (N.T. 75) The child's mother was living with a friend who could not have both her and the child. (N.T. 21) After the child had been with the father's parents about a week the mother came and got him for the weekend. Three or four days after she returned the child the father's parents told the mother that they were "going on vacation and she would either have to come to get the baby or we'd have to take him with us—" (N.T. 76) The mother told the father's parents to take the child to her aunt in Bowie, Maryland (N.T. 76–77). They did. (*Id.*)

The third episode occurred in September, 1976, on Friday of Labor Day weekend.[2] The mother in her testimony

2. It was in fact the fourth episode, for another episode occurred before it, in July, 1976, which is not referred to by the hearing judge in his opinion, or by the majority. The father in his testimony described this episode as follows:

described the circumstances leading up to this episode as follows:

A. Yes, I called him up, this was on a Friday afternoon. I asked him if he would come down and pick up Marty and keep him for a few weeks. I did not have a baby sitter to watch Marty, my baby sitter had quit on me. I was having financial problems, and I asked him if he would keep Marty for a couple of weeks.

Q. Was there a discussion between yourself and the Respondent concerning the length of time he was to keep the child?

A. It was to be for a couple of weeks.

Q. She then came up in September—well, you—no, tell us about the September incident.
A. All right, September. She had already come up previously before that for a weekend visit.
Q. All right, tell us about that.
A. We had improved the communications between us and she came up for a weekend.
Q. To Pennsylvania?
A. Right up to here. She visited my apartment and she stayed the night with the baby. And that night we were there and we had about a couple of friends over and we talked about Judaism. She got extremely intoxicated that night and the baby started crying, she was intoxicated to the point where she couldn't walk up the stairs—we had a townhouse—walk up the stairs and take care of the baby. My wife went up and I went up. He just woke up crying, it was nothing serious. At that point, she couldn't do it.
Q. And then what happened next?
A. I took her back down to my parent's house.
Q. With the baby?
A. Well, wait a minute. I dropped the baby off at my parent's house and then took her to her apartment, and then came back up.
Q. Was she living alone?
A. As far as I know she's had men living with her; a submarine lieutenant, a man named Bill or Phil. That's two of them that I know of, that she has told me.
Q. Now you dropped the baby off at your parent's and you took her where?
A. Took her to her apartment.
Q. Why did you drop the baby off at your parent's?
A. Because that's where she said she wanted it, because she said she couldn't take care of it. And she wouldn't leave it with me. N.T. 101–02.

The mother admitted having been in the father's house (N.T. 14), but she denied having been too intoxicated to go up the stairs or to care for the child. (N.T. 124)

Q. Was there an agreement between you and he as to what was to happen to the child at the end of that couple of weeks?

A. It was agreed upon that he would enjoy his stay up there and he would act very adult about it, and he would bring him back.

N.T. 4–5.

The father's testimony was as follows:

A. I received a call from her Friday, Labor Day, I believe it was, or September 3rd, right around the beginning of the month there about 7:30. She said, "Would you come down and pick up the baby?" I said, "Yes, I'll be there first thing in the morning." She said, "No, you come now."

So I left Pennsylvania at 8:00 o'clock, I got down there at midnight, went to her apartment that she gave me the address for. She was at that time intoxicated. I couldn't smell any liquor, but her eyes were glazed and she was incoherent. She gave me the baby, and his clothes, and two toys.

Q. All his clothes?

A. All his clothes. And I asked her, I said—right in the living room I asked her, as I'm sitting here in this court-room I said, "When do you want him back?" And she said, "I have no idea."

N.T. 102–103.

The father went on to testify that "[w]hen [he] first got [the child] he threw tantrums, complete fits or rages over every-thing, at anything you did" (N.T. 104), but that "after about three weeks," the child "was just settling down, calming down" (N.T. 104–105). Accordingly, when the mother asked him to return the child (N.T. 11), he refused, and she initiated the present litigation.

-2-

Of the foregoing episodes, the first is of the least impor-tance. The abruptness of the episode, and the evidence of

drinking, are disquieting; it must, however, have been one of the lowest points in the mother's life—separated from the man with whom she had been living, rejected by his parents, rejected by her mother, without work, and with the child to care for. Besides, it occurred almost two years ago. If the mother had settled down, there would not be any difficulty in her being awarded custody of the child.

The record is clear, however, that she has not settled down, but has instead become less stable; there is no other way to interpret the episodes of June, July (*see* footnote 2, *supra*), and September, 1976. I am quite aware that this description of these episodes is very different from the dissent's. I am content, however, to rest on the record, adding only these two comments.

First: At several points the dissenting opinion states a matter as it was described by the mother. *See* in particular the dissenting opinion at 200. As I have noted, however, with I believe appropriate citations to the record, on all of these points the mother's testimony was specifically and in detail contradicted by that of the father, or of his father. It is plain from the hearing judge's opinion that he simply did not believe the mother's explanations of why she had moved the child about so often, but instead accepted the testimony of the father and his witnesses—his father and his wife— both with respect to how the mother had conducted herself and with respect to the adverse consequences to the child. I can find no warrant for the dissent's rejection of the judge's appraisal, nor does the dissent offer any. We have repeatedly, and wisely, held that we must defer to a hearing judge's appraisal of the witnesses' credibility. *Commonwealth ex rel. Tobias v. Tobias*, 248 Pa.Super. 168, 374 A.2d 1372 (1977); *In Interest of Clouse*, 244 Pa.Super. 396, 400, 368 A.2d 780, 782 (1976); *Clair Appeal*, 219 Pa.Super. 436, 437, 281 A.2d 726, 726 (1971). *Accord*: *Commonwealth ex rel. Doberstein v. Doberstein*, 201 Pa.Super. 102, 192 A.2d 154 (1963); *Commonwealth ex rel. Dinsmore v. Dinsmore*, 198 Pa.Super. 480, 182 A.2d 66 (1962). Moreover, even

simply from the printed record the mother's testimony does not seem impressive. For example, her testimony was often sketchy—thus she did not disclose until cross-examination her numerous moves—and sometimes it was improbable— she not only denied living with any man during the past two years (which may well be so) but also having had any boyfriends (N.T. 18). Rather than elaborate further, however, I refer again to our duty to defer to the hearing judge.

Second: At the end of its opinion the dissent says: "More importantly, . . . the circumstances giving rise to these episodes no longer exist, and therefore are not relevant to this analysis." Dissenting opinion at 202. I can only respond, with some sorrow, that I can find no basis for this statement in the record, which instead contradicts it. The last, and by far the most serious, of the episodes occurred only a little more than a month before the hearing. It would be a fortunate development if the circumstances that produced that episode "no longer exist," but I do not know why the majority supposes (in fact, asserts) such a development. Instead of a diminuendo, the record discloses a crescendo of instability.

-3-

So far the case has presented no novel point; it has simply been a matter of reading the record, and then applying the long-settled principle of deferring to a hearing judge's findings, when, as here, those findings are supported by competent evidence. There is one point, however, that may not be novel but nevertheless requires special comment.

In a Supplemental Brief counsel for the mother has argued that

[t]he general rule enunciated by this Court is that the right of a mother to the custody of an illegitimate child is superior to that of all other persons, including the father, for ordinarily the best interests of the child can be served by maternal care, and the needs of a child of tender years

are best served by its mother. Unless compelling reasons appear to the contrary, such child should be committed to the care and custody of the mother.

Appellant's Supplemental Brief at 6–7.

In support of this argument counsel cites *Latney's Appeal,* 146 Pa.Super. 20, 21–22, 21 A.2d 521, 522 (1941), where it was said:

[T]he right of a mother to the custody of an illegitimate child, is superior to that of all other persons for, ordinarily, the best interests of the child can be served by maternal care.

Counsel also cites *Commonwealth ex rel. Kevitch v. McCue,* 165 Pa.Super. 49, 51, 67 A.2d 582, 583 (1949), where it was said:

A father of an illegitimate child is not legally related to it and the law recognizes the right of the mother to its custody. The general rule therefore has been that the right of the mother to custody of an illegitimate child is superior to that of all other persons, including their father, for ordinarily the best interests of the child can be served by maternal care. [citing *Latney's Appeal, supra* ]

These cases no longer state the law, and are overruled.

In the first place, the idea that "the best interests of the child can be served by maternal care" is simply another way of stating the "tender years presumption". That presumption has been repudiated. *Commonwealth ex rel. Schall v. Schall,* 251 Pa.Super. 262, 380 A.2d 478 (1977); *Commonwealth ex rel. Lee v. Lee,* 248 Pa.Super. 155, 374 A.2d 1365 (1977); *McGowan v. McGowan,* 248 Pa.Super. 41, 44 n. 1, 374 A.2d 1306, 1308 (1977). *And see Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 300, 368 A.2d 635, 640 (1977).[3]

**3.** In this regard it may be noted that the majority opinion relies upon *Commonwealth ex rel. Logue v. Logue,* 194 Pa.Super. 210, 166 A.2d 60 (1960). Majority opinion at 183. *Logue* was a "tender years" case. As such, it was discussed and its reasoning specifically rejected, in *In re: Hernandez,* 249 Pa.Super. 274, 280 n. 2, 376 A.2d 648, 651 n. 2(1977).

■ In the second place, the assertion that a mother's "right" to the custody of an illegitimate child is "superior" to the father's can no longer be countenanced. *See Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). We have gone to considerable pains to hold that neither parent has a "right" to custody, the question being what is in the child's best interests. *In re: Hernandez, supra* ; *Commonwealth ex rel. Grillo v. Shuster,* 226 Pa.Super. 229, 236, 312 A.2d 58, 62 (1973). More basic than even this objection, however, is the fact that to prefer the mother's claim to the father's is an entirely sex-based preference and as such is proscribed by the Equal Rights Amendment to the Pennsylvania Constitution, Pa.Const., art. I (1974). *See Commonwealth ex rel. Spriggs v. Carson, supra* (plurality opinion, holding "tender years presumption" proscribed by the Equal Rights Amendment); *McGowan v. McGowan, supra.*

■ True, the child before us is illegitimate. He is, however, just as illegitimate with respect to the mother as he is with respect to the father. The respective claims of the mother and father to custody of the child therefore start out on an equal basis; the father's burden of proof is no less, but neither is it any more, than the mother's burden, and custody must be awarded solely according to what the preponderance of the evidence shows will be in the child's best interests. *In re: Hernandez, supra* (collecting cases).

It is therefore apparent that when parents dispute about which one of them should have custody of their illegitimate child, the hearing judge is obliged to satisfy two distinct, although overlapping, claims. First, the judge must satisfy each parent's claim to be treated as equal to the other. The judge must start his examination of the case on this basis; he therefore must not discriminate against the father—or the mother—simply because the child is illegitimate. Second, the judge must satisfy the child's claim to have the custody decision made according to the child's best interest. It is at this point that the claims overlap. If the judge

starts his examination of the case by discriminating against the father, not only does he treat the father unfairly but he also treats the child unfairly, for he has improperly narrowed the definition of what disposition might be in the child's best interest.

It seems to me that the dissenting opinion reaches a result contrary to both of these claims—the father's and the child's. I readily acknowledge that the dissenting opinion is silent with respect to both claims; reading the opinion, one would never know that the mother's counsel has vigorously argued to us that the fact of illegitimacy should be dispositive. He has so argued, however; and the result reached by the dissent is consistent with acceptance of the argument. Given these circumstances I think we must leave no room for misunderstanding but must explicitly hold that the fact of illegitimacy not only is not dispositive but is irrelevant.

CERCONE, J., joins in this opinion.

JACOBS, Judge:

I respectfully dissent. For the reasons that follow, I conclude that the best interests of the child require that he be placed in the custody of his mother, and would therefore reverse the order of the court below.

Boyd Lee Martin, Jr., the subject of this action, was born July 7, 1974, while appellant and appellee, unmarried, were cohabiting in Baltimore County, Maryland. Four months later, appellee, the putative father of the child, left the mother and child and moved to Pennsylvania. Appellant continued to care for and support the child except as noted below until September, 1976, when appellee refused to return the child after a two-week visitation. After repeated unsuccessful attempts to have the child returned to her, appellant procured counsel and instituted this habeas corpus action for custody of the child. Following a full hearing in the court below, appellant's petition was dismissed and custody awarded to the putative father. This appeal followed.

The paramount consideration in our review of custody disputes between parents is the best interests and welfare of the child. *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635 (1977); *Commonwealth ex rel. Parikh v. Parikh,* 449 Pa. 105, 296 A.2d 625 (1972); *Commonwealth ex rel. Lee v. Lee,* 248 Pa.Super. 155, 374 A.2d 1365 (1977).

In the exercise of our appellate function, we are mindful of the fact that the scope of our review in child custody cases is of the broadest type and, while we cannot nullify the fact-finding function of the hearing judge, we are not bound by a finding which has no competent evidence to support it. *Commonwealth ex rel. Holschuh v. Holland-Moritz,* 448 Pa. 437, 292 A.2d 380 (1972); *Commonwealth ex rel. Gifford v. Miller,* 213 Pa.Super. 269, 273–274, 248 A.2d 63 (1968).

Here the record fails to bear out the trial judge's conclusion that appellant suffers from a basic instability which is harmful to the child's emotional welfare. To the contrary, testimony in the court below clearly indicates that the mother leads a stable life and can provide a healthy and normal environment in which to raise her child.

Appellant testified that she lives in Maryland and is employed there by a law firm as a legal secretary/paralegal at a salary of $135.00 per week. She maintains a one-bedroom apartment which rents for $200.00 per month, and has a full-time babysitter to look after the child while she works. The mother also testified that while the child was in her custody, she ate breakfast and dinner with him, and took him to the doctor regularly for normal visits. Additionally, her testimony that the child was a happy, normal boy was corroborated by two other witnesses, appellant's mother and a friend.

Appellee, the admitted father of the child, testified at the time of the hearing that he was studying to be an electrician, and receiving VA benefits for five-and-one-half years military service. He rents a two-bedroom apartment in Roslyn, Pennsylvania, for $245.00 per month, where he lives

with his second wife, Rita, and her son by a prior marriage. The father also testified that from the time he abandoned the mother and child, he contributed only $100.00 to the child's support. While he attempted to explain this circumstance by the fact that he was in the military service at the time, appellee admitted on cross-examination that he never made application to the Army for an allotment for the child.

The court below apparently focused on that facet of the father's testimony dealing with appellant's alleged erratic and unstable behavior in determining that she is unfit to have custody of the child. I find, however, after thorough examination of the record, that these circumstances were either satisfactorily explained by the mother, or no longer exist. For example, appellee testified that the mother drank heavily and took thirty to thirty-five barbiturates a day in the past. Appellant frankly admitted consumption of alcohol, although not on a regular basis, and testified that she last took barbiturates more than eight years ago. In fact, she stated that appellee encouraged her to use drugs when they first met.

The most critical events brought out at the hearing below concern certain occurrences characterized as "crisis situations" by the lower court. According to appellee, the first situation occurred in January, 1975, when appellant travelled from Maryland to Pennsylvania, checked into a motel, and called appellee to come get the child. The second episode occurred in June, 1976, when, according to appellee's father, appellant telephoned him to come immediately and pick up the child, which he did. The final incident, which led to this action, happened in September, 1976, when the mother called appellee and told him to come pick up the child immediately. The father did as requested, and subsequently refused to return the child to appellant. The lower court cited these situations as evidence of a pattern of instability in the mother. I must disagree. The mother testified that on these occasions she temporarily relinquished custody of the child due to acute financial problems and

inability to obtain a babysitter. These actions were taken in the best interests of the child at the time, and do not indicate to me abandonment by the mother, or instability on her part. In fact, the court below apparently overlooked the obvious fact that appellant's financial predicament was due in part to appellee's failure to assume any obligation to support the child.

More importantly, however, the circumstances giving rise to these episodes no longer exist, and therefore are not relevant to this analysis. As previously indicated, the mother now has a good job, a suitable home, and an experienced babysitter available while she is at work. In determining fitness for custody, the facts of the situation as it exists at the time of the hearing control, not past circumstances. *See Commonwealth ex rel. Tucker v. Salinger*, 244 Pa.Super. 1, 366 A.2d 286 (1976); *Augustine v. Augustine*, 228 Pa.Super. 312, 324 A.2d 477 (1974).

Finally, the court below indicated in its opinion that the child's best interests were not being served by "being raised as much by babysitters as by the mother." In addition to being contrary to the evidence brought out at the hearing, as well as a circumstance that no longer exists, this factor, in my view, is an impermissible indirect penalty against the mother who is compelled to work to support her child. *See, e. g., Commonwealth ex rel. Logue v. Logue*, 194 Pa.Super. 210, 166 A.2d 60 (1960).

For the foregoing reasons, I would reverse the order of the court below dismissing appellant's petition, and direct that custody of the child be awarded to her.

WATKINS, President Judge, and VAN der VOORT, J., join in this opinion.