421 A.2d 769

G. M. P.

v.

A. P., Appellant.

Superior Court of Pennsylvania.

Argued Dec. 3, 1979.

Filed Aug. 15, 1980.

Gerald I. Roth, Allentown, for appellant.

Richard F. Stevens, Allentown, for appellee.

Before SPAETH, CAVANAUGH and O'KICKI, JJ.*

SPAETH, Judge:

This is a child custody case. The lower court awarded custody to the father, and the mother now appeals. We have concluded that we should remand for further proceedings. Four matters in particular require discussion.

---

* President Judge JOSEPH F. O'KICKI, of the Court of Common Pleas of Cambria County, Pennsylvania is sitting by designation.

–1–

The father and mother were married in April 1973, and had one child, Katherine, who is the subject of this litigation. The record does not indicate the date of Katherine's birth, but in the briefs to us she is said to be 7 years old. The mother had had a child by a prior marriage, Monica. Neither does the record indicate the date of Monica's birth, but at a hearing in November 1979, she said that she was 16 years old. The family lived in Stroudsburg, Pennsylvania.

Marital difficulties developed, and in January 1978 the father filed a petition for writ of habeas corpus, praying the court "to determine the issue of [Katherine's] custody as between the parents." The mother filed an answer, alleging that "since both Petitioner and Respondent reside in the same home with their minor child [Katherine], the question of custody is moot," and that the petition should therefore be dismissed. It appears that the writ issued, but no hearing was held. Instead, on February 24, 1978, on the father's motion, the matter was continued generally.

On September 18, 1978, the father filed a petition alleging, among other things, that the mother had "secreted" Katherine, and he had been "unable to locate her;" that the mother was "originally from Columbia [sic], South America and had contacts there as well as in Spain where she frequently visits;" that the mother had threatened to take Katherine to Spain, and had told the father that he would never see Katherine again; that he believed that Katherine "either [was] or [would] soon be in Florida at 7720 S.W. 98th Court, Miami, Florida, 33173, the home of one Howard Bannister, a paramour of [the mother's];" and that he believed that the mother would "move [Katherine] again" if she learned of the petition. Attached to the petition was a form of order, which the lower court completed and and signed, ex parte, as follows:

AND NOW, this 18th day of September, it is ordered that custody of [Katherine][1] is awarded to [the father]

---

1. To minimize possible future embarrassment to Katherine, here and throughout we have omitted her last name and her parents' names.

until the 2nd day of October, 1978, when the matter of the custody of [Katherine] will be heard by the Court of Common Pleas of the Forty–third Judicial District, Monroe County, Commonwealth of Pennsylvania, at which time, [the father] shall, if he has been able to locate the child, bring her person before the Court.

On October 2, 1978, the hearing set by this order was held. The only witness was the father. It appears from his testimony that he hired a private investigator, who found out where Katherine went to school in Miami, and that he flew to Miami, went to the school, introduced himself to Katherine's teacher as her father, took her from the school and brought her back to Pennsylvania. (N.T. 12–13, 10/2/78). At the conclusion of the hearing, the court continued the matter to a date to be set after consultation with counsel, and ordered that temporary custody be continued with the father. (N.T. 57, 10/2/78)

■ We cannot condone the procedure initiated by the father and adopted by the lower court. By its order of September 18, 1978, the lower court virtually deputized the father as its officer, directing him to "locate [Katherine] [and] bring her person before the Court." Child custody disputes are as bitter as any disputes that a court decides. An order such as the lower court's can only exacerbate that bitterness; indeed, in other circumstances the order might have led to violence. Suppose, for example, that the mother had come to the school in response to a call from Katherine's teacher. One can imagine the sort of quarrel that might have erupted between the mother, trying to keep Katherine with her, and the father, cloaked with the authority of the lower court's order, and claiming the right to take Katherine away with him.

One of the purposes of the Uniform Child Custody Jurisdiction Act, Act of June 30, 1977, P.L. 29, No. 20, § 1 *et seq.*, eff. July 1, 1977, 11 P.S. § 2301 *et seq.*, is to prevent unilateral action by one parent. Thus, Section 2(a)(5) of the Act, 11 P.S. § 2302(a)(5), provides that the Act is intended to "deter abductions and other unilateral removals of children

undertaken to obtain custody awards." Instead of issuing an *ex parte* order deputizing the father to find Katherine and bring her back to Pennsylvania, the lower court should have complied with the procedures set forth in the Act. Section 4 of the Act, 11 P.S. § 2304, provides in part as follows:

> (a) A court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

> (1) this State:

> (ii) had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this State;

Thus, the lower court had jurisdiction to decide who should have custody of Katherine. Section 12 of the Act, 11 P.S. § 2312, provides in part as follows:

> (b) If a party to the proceeding whose presence is desired by the court is outside this State with or without the child the court may order that the notice given under section 6 include a statement directing that party to appear personally with or without the child and declaring that failure to appear may result in a decision adverse to that party.[2]

2. Section 6 of the Act, 11 P.S. § 2306, provides:

§ 2306. Notice to persons outside this State; submission to jurisdiction

(a) Notice required for the exercise of jurisdiction over a person outside this State shall be given in a manner reasonably calculated to give actual notice, and may be:

(1) by personal delivery outside this State in the manner prescribed for service of process within this State;

(2) in the manner prescribed by the law of the place in which the service is made for service of process in that place in an action in any of its courts of general jurisdiction;

(3) by any form of mail addressed to the person to be served and requesting a receipt; or

If necessary, the court could have ordered the father "to pay travel and necessary expenses" of the mother. 11 P.S. § 2312(c).

–2–

As mentioned above, after the hearing held on October 2, 1978, the matter was continued. A second hearing was held on November 2, 1978.[3] In the meantime, on October 27, 1978, Howard Bannister's deposition was taken; it will be recalled that the father's petition of September 18, 1978, had alleged that Bannister was "a paramour" of the mother's, and that the mother had gone with Katherine to his house in Miami. The second hearing was far more comprehensive than the first. The transcript of the first hearing, at which only the father testified, is 59 pages. At the second hearing, both the father and mother testified, and in addition, the father called ten witnesses, the mother five; the transcript, including exhibits, is 458 pages. In addition, the docket entries state that on November 8, 1978, the lower court ordered the Children's Bureau of Monroe County to investigate the father's home, and further ordered the Bureau to request the appropriate authorities of Dade County, Florida, to investigate the mother's home "c/o Howard William Bannister." The reports of these investigations have not been included in the record transmitted to us, although the lower court's opinion states that it has the "reports before us." (Slip. op. at 1) On February 15, 1979, the lower court filed an order with an opinion awarding custody of Kathe-

(4) as directed by the court including publication, if other means of notification are ineffective.

(b) Notice under this section shall be served, mailed, or delivered or last published at least 10 days before any hearing in this State.

(c) Proof of service outside this State may be made by affidavit of the individual who made the service, or in the manner prescribed by the law of this State, the order pursuant to which the service is made, or the law of the place in which the service is made. If service is made by mail, proof may be a receipt signed by the addressee or other evidence of delivery to the addressee.

(d) Notice is not required if a person submits to the jurisdiction of the court.

3. The title page of the transcript gives the date as November 2, 1979.

rine to the father. It is from this order that the mother has taken the present appeal.

■ In every child custody case, the lower court must file "a comprehensive opinion reflecting a thorough analysis of the record as a whole and specifying the reasons for the ultimate decision." *Commonwealth ex rel. Grillo v. Shuster*, 226 Pa.Super. 229, 237, 312 A.2d 58, 63 (1973). *See also Commonwealth ex rel. Forrester v. Forrester*, 258 Pa.Super. 397, 392 A.2d 852 (1978); *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976). Where the lower court has failed to file such an opinion, we have remanded for further proceedings. In *Forrester*, the lower court's opinion discussed three incidents developed in the record, but did not discuss the parents' present fitness and ability to provide for the children. In *Gunter*, the lower court's opinion treated as dispositive evidence of the mother's relationship with another man; other evidence was either ignored or treated in a manner that appeared selective rather than impartial. In *Grillo*, the lower court's opinion did not appraise conflict in the testimony and did not comment upon testimony critical of the father and favorable to the mother. Consequently, in each of these cases we found ourselves unable to discharge our appellate responsibility. Thus, in *Forrester*, it was stated:

Having reviewed the record, we cannot state that the lower court's disposition in this case was incorrect. On the other hand, neither can we say that it was based on the evidence evaluated by the proper standards. We are not in a position to make a determination as to the children's best interests because the court below, which heard the testimony and observed the witnesses, has not treated many of the relevant factors in its opinion. 258 Pa.Super. at 400, 392 A.2d at 854.

And in *Grillo*, it was stated:

The transcript reflects important facts not mentioned in the hearing judge's opinion. It is therefore impossible to evaluate how much weight these facts were given, with the result that there cannot be an intelligent appellate disposition.

226 Pa.Super. at 229, 312 A.2d at 58.

The same observation must be made here. We do not propose to undertake a detailed discussion, or even summary, of the record. Suffice it to say that the lower court's discussion of the record does not enable us to make an intelligent evaluation of the testimony. If one were to judge only from the lower court's opinion, one would conclude that the evidence was quite one–sided, and very much in the father's favor. In fact, however, the transcript discloses that the issues were hotly disputed. There was indeed evidence of what the lower court characterized as "the instability" of the mother. (Slip. op. at 6.) However, much of this evidence was contradicted. Also, while there was evidence favorable to the father, there was also evidence charging him with drunkenness, violence and sexual misconduct. As the cases that have been cited above show, in these circumstances it was the lower court's duty to discuss all of the evidence, and to explain why it regarded some parts of it as more persuasive or important than other parts.

In this regard, it may be noted that apparently the lower court reached its decision and prepared its opinion without the benefit of a transcript of the second hearing (at which, as has been mentioned, most of the testimony was presented). In his brief to this court, counsel for the mother states that he will refer only to the transcript of the first hearing because the testimony presented at the second hearing had not been transcribed. (Brief for appellant at 8, 9, 11) Similarly, in his brief, counsel for the father refers to the mother's testimony "as yet untranscribed." (Brief for appellee at 5) On December 4, 1979, after argument before this court, counsel for the mother wrote our prothonotary, stating that the court reporter had promised that the testimony presented at the second hearing would be transcribed, and asking the prothonotary to "check the record to see that everything is complete." We have now received the transcript; it is time–stamped by the prothonotary of the lower court as of January 17, 1980. This was most irregular. The transcript should have been lodged "not later than 14 days

after receipt of [the] notice [of appeal]." Pa.R.A.P. 1922(a). *And see Commonwealth v. Fowler*, 275 Pa.Super. 544, 419 A.2d 34 (1980).

We shall expect that on remand, the lower court will give us the benefit of its analysis of the conflicting testimony that has now been transcribed. In addition, we shall expect that the record will be supplemented by further evidence. *See Commonwealth ex rel. Forrester v. Forrester, supra.*

One of the mother's principal contentions is that in practical effect, the lower court's award is an award not to the father but to the father's parents: "This is a realistic fact [counsel argues], for [the father] works long hours as a real estate developer in the Poconos and the child is left with the paternal grandparents who frequently take her to Allentown, Pennsylvania, where they live." (Brief for appellant at 14) In its opinion, the lower court states that the father "will be assisted in caring for the child by his parents, a middle–aged retired couple, who profess, we believe sincerely, their concern for their granddaughter." (Slip op. at 3–4) The father's parents both testified at the second hearing. They are in their sixties and retired, and live in Allentown. (11/2/78 N.T. 194–95, 197–98, 202) On cross–examination, the father's father testified as follows:

    Q: Do you have an intention of selling your house [in Allentown]?

    A: No.

    Q: Even if the Court should see fit to grant custody of Katherine to your son, . . . you have no intentions of selling the house?

    A: Well, I would move up with him.

    Q: Would you sell the house?

    A: Sure I would sell the house then.

(11/2/78 N.T. 203)

On remand, the lower court will be able to receive testimony regarding what arrangements the father has made for Katherine's care while he is away from home, and on the basis of that testimony, determine whether there is any merit to the

mother's contention that in practical effect, it is not the father but the father's parents who have custody of Katherine. *See In re Hernandez*, 249 Pa.Super. 274, 298, 376 A.2d 648, 660 (1977).

In addition, on remand, the lower court will be able to receive testimony that will inform it regarding the current activities of the father and mother, and also of Katherine. In this regard, we note that in its opinion, the lower court remarks that the reports it received from the Monroe County Children's Bureau, as to the father's home, and from the authorities in Dade County, Florida, as to the mother's, were "lacking in substance." (Slip op. at 5) It may well be that the court will wish to order further reports, which, like the ones already ordered and received, should be made part of the record. *See Commonwealth ex rel. Mary Ann S. v. Daniel S.,* 278 Pa.Super. 577, 420 A.2d 692; *Rummel v. Rummel,* 263 Pa.Super. 97, 397 A.2d 13 (1979); *Commonwealth ex rel. Oncay v. Oncay,* 153 Pa.Super. 569, 34 A.2d 839 (1943).

–3–

■ Near the end of its opinion, the lower court states: Lastly, Petitioner [the father] has cited us the cases of *Commonwealth v. McCloud*, 193 Pa.Super. 171 (1960)[4] and cases cited therein, which stands for the proposition that only unusual circumstances will justify placing a child beyond our jurisdiction, under the eyes of a non–Commonwealth resident. This weighs significantly once again in making our determination.

(Slip op. at 7)

This statement reflects error. Although the law once was as the lower court states, it no longer is. Thus, in *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977), the Supreme Court specifically criticized the "rule of preference" to a resident over a non–resident. A majority of this court had relied on the rule, quoting from *Common-*

4. [*sic*] The citation is an evident typographical error; the full citation is *Commonwealth ex rel. McLeod v. Seiple*, 193 Pa.Super. 131, 163 A.2d 912 (1960).

*wealth ex rel. McLeod v. Seiple* the same paragraph alluded to by the lower court in the present case. Reversing, the Supreme Court stated:

> [The rule] was obviously more tenable in the days of a less mobile society. In today's accessible and communicative world the validity of this proposition is open to serious question. It would be presumptive [*sic*; presumptuous?] to believe that the care and concern of the Pennsylvania Courts for the best interest and the welfare of a child is not shared by our sister States.
>
> 470 Pa. 290 at 299, 368 A.2d 635 at 639.

*And see*: *Davidyan v. Davidyan*, 230 Pa.Super. 599, 327 A.2d 145 (1974); *Commonwealth ex rel. Shoemaker v. Shoemaker*, 211 Pa.Super. 188, 235 A.2d 455 (1967); *Commonwealth ex rel. Buckner v. Barr*, 173 Pa.Super. 124, 95 A.2d 355 (1955). These observations by the Supreme Court are particularly in point, given the wide adoption of the Uniform Child Custody Jurisdiction Act.[5]

–4–

■ In its opinion, the lower court states:

> We are hopeful that the parties will be able to accommodate one another, and agree on reasonable visitation rights, and opportunities as to the child as to Respondent [the mother]. Should this not be possible, we will, of course, upon proper petition, again seek to resolve this quandary.
>
> (Slip op. at 7–8)

We can discern no reason to believe that the parties "will be able" to "agree on reasonable visitation rights." As we have remarked, the issues have been hotly disputed. Indeed, the lower court has characterized the record as "replete with examples of the settled hatred and estrangement of the parties." (Slip op. at 2) In these circumstances, on remand, the lower court should, after receiving such testimony as

5. The Act is now law in at least 41 states. *See* 6 Fam.Law Rptr. 1093 (April 22, 1980).

may be appropriate, enter an order providing for visitation by the parent not awarded custody. It is of the highest importance that a child maintain as wholesome a relationship with each parent as possible. To this end, the parent not awarded custody must be assured of the ability to visit the child. *See Pamela K. v. Roger D. J.*, 277 Pa.Super. 579, 419 A.2d 1301; *Fernald v. Fernald*, 224 Pa.Super. 93, 302 A.2d 470 (1973); *Leonard v. Leonard*, 173 Pa.Super. 424, 98 A.2d 638 (1953); *Commonwealth ex rel. Timmons v. Timmons*, 161 Pa.Super. 174, 54 A.2d 75 (1947).

The case is remanded for further proceedings consistent with this opinion. Following such proceedings, the lower court shall enter a new order; if any further appeal is taken, it must be from that order.

CAVANAUGH, J., concurs in the result.

O'KICKI, J., files a dissenting statement.

O'KICKI, Judge, dissenting:

The best interests of the child should be the prevailing fulcrum for the trial court to apply in every child custody dispute. In this case, the trial court observed the demeanor of the witnesses, their interaction with the child and their concern for the welfare of the child. Such findings by the trial court are based upon communicative facts set forth in the record and non—verbal communicative facts not apparent from the record.

The record in this case is supportive of the trial court's findings. The trial court's opinion is sufficiently comprehensive and contains sufficient specific reasons for the award of custody. *Comm. ex rel. Grillo v. Shuster*, 226 Pa.Super. 229, 312 A.2d 58 (1973) and its posteriority.

While the trial court volunteers the applicability of *Comm. v. McLeod*, 193 Pa.Super. 131, 163 A.2d 912 (1960), it has no legal relationship to the ultimate legal issue in this case.

I would affirm the lower court opinion in this extremely difficult factual dispute.