427 A.2d 185

COMMONWEALTH of Pennsylvania ex rel. Edward S. PIGGINS, Jr., Appellant,

v.

Christine Piggins KIFER.

Superior Court of Pennsylvania.

Argued Nov. 11, 1980.

Filed March 6, 1981.

Wayne H. Port, Uniontown, for appellant.

Donald J. McCue, Connellsville, for appellee.

Before SPAETH, WICKERSHAM and LIPEZ, JJ.

SPAETH, Judge:

This is a child custody case. A court in Michigan entered an order specifying when and where the father could visit the child. The lower court modified the order. We hold that the lower court erred in two respects: it failed to file a comprehensive opinion stating, with reference to the evidence, the reasons for its modification of the Michigan court's order; and it failed to give the Michigan court's

order the effect required by the Uniform Child Custody Jurisdiction Act, Act of June 30, 1977, P.L. 29, No. 20, § 1 *et seq.*, 11 P.S. § 2301 *et seq.* We shall therefore reverse and remand for further proceedings.

The parties were married on June 14, 1975, and lived in Detroit, Michigan. Their only child, Kelley Anne, was born on September 9, 1976. In March 1977 the mother and father separated, the mother moving with Kelley to Dunbar, Fayette County, Pennsylvania, the father remaining in Michigan. On June 14, 1977, the father filed an action in divorce in Michigan. On June 17, 1977, the Michigan court entered a temporary visitation order.

After encountering difficulty in enforcing the temporary visitation order, the father, in December 1977 and January 1978, asked the Michigan court to hold the mother in contempt. After a hearing, at which the mother was not present but was represented by counsel, the Michigan court on January 24, 1978, entered an order providing for the following visitation rights by the father:

1. The Plaintiff, EDWARD S. PIGGINS, JR., shall have the right to visitations with said minor child, on the dates and under the terms hereinafter set forth, and during said visitations the Plaintiff shall have the right to return with said child to the State of Michigan.

2. The visitations shall commence and terminate at the Terminal building at the Pittsburgh International Airport, in Pittsburgh, Pennsylvania on the following dates:

   A. FIRST VISITATION: Commences on February 9th, 1978 at 12:00 Noon, and continues through 5:00 P.M. on Sunday, February 12th, 1978;

   B. SECOND VISITATION: Commences on Thursday, April 20th, 1978 at 12:00 Noon, and continues through 5:00 P.M. on Sunday, April 23rd, 1978;

   C. THIRD VISITATION: Commences on Saturday, July 1st, 1978 at 10:00 A.M. and continues through 5:00 P.M. on Wednesday, July 5th, 1978;

D.  FOURTH VISITATION:  Commences on Saturday, September 2nd, 1978 at 10:00 A.M. and continues through 5:00 P.M. on Tuesday, September 5th, 1978;

E.  FIFTH VISITATION:  Commences on Saturday, December 23rd, 1978 at 10:00 A.M. and continues through 5:00 P.M. on Tuesday, December 26th, 1978;

3.  If, because of illness of the minor child, Kelley Anne Piggins, the Defendant must cancel any scheduled visitation, verification by a medical Doctor shall be submitted to the Plaintiff, and said visitation shall be rescheduled for an equal period, within six weeks thereafter, and said rescheduled visitation shall commence on a date selected by the Plaintiff, EDWARD S. PIGGINS, Jr.

4.  Cancelation of any scheduled visitation for any reason, by the Plaintiff, shall require immediate notice to the Defendant.

5.  The DEFENDANT, CHRISTINE PIGGINS, shall also be required to pack the necessary clothing, personal affects and any medicine required by KELLEY ANNE during such visitation, and bring said items to the Greater Pittsburgh International Airport for the commencement of each such visit.

IT IS FURTHER ORDERED that the Plaintiff shall have such further reasonable rights to visitation with said minor child at such times and places as shall be mutually agreed upon with the Defendant.

The court also ordered that upon the mother's failure to comply with the visitation order, "the Support Order now pending in this cause shall be immediately terminated." When the mother continued in her failure to comply with the visitation order, the court, in February 1978, did terminate its order of support.

On June 9, 1978, the Michigan court entered a final decree divorcing the parties, incorporating in the decree a visitation order paralleling the court's earlier order. As in the earlier order, the mother was ordered to take Kelley to the Pittsburgh airport, and pick her up there after her visits, and the

father was given the right to return with Kelley to his home in Michigan; instead of five visits, as in the earlier order, four visits were provided, each from 12:00 noon Thursday through either 5:00 or 6:00 P.M. Sunday, on the first weekend in March, Father's Day weekend in June, the second weekend in September, and the third weekend in December.

Again, the mother refused to comply with the visitation order. Accordingly, on October 2, 1978, the father filed an action for habeas corpus in Fayette County. After hearings, on February 27 and 28, 1979, the lower court, on June 1, 1979, filed an opinion and an order modifying the visitation order of the Michigan court, as follows:

AND NOW, June 1, 1979, it is hereby ordered, directed and adjudicated that Petitioner, Edward S. Piggins, shall have the right to visitation with the minor child, Kelley Ann Piggins, based upon the following schedule and terms:

A. (1) Annually, a visit shall commence at 12:00 Noon on the first (1st) Thursday in the month of March, and shall continue through the following Sunday to 6:00 P.M.

(2) Annually, a visit shall commence at 12:00 Noon on the Thursday immediately preceding Father's Day in the month of June, and shall continue through Father's Day at 6:00 P.M.

(3) Annually, a visit shall commence at 12:00 Noon on the second (2nd) Thursday in the month of September, and shall continue through the following Sunday to 5:00 P.M.

(4) Annually, a visit shall commence at 12:00 Noon on the third (3rd) Thursday in the month of December, and shall continue through the following Sunday to 5:00 P.M.

B. The scheduled visits under A(1), A(2), and A(3) shall allow the Petitioner to take the minor child into his possession while visiting with said minor child, but he shall not be permitted to leave the general vicinity of Fayette County, Pennsylvania during said visitations

(overnight stays with the child are specifically permitted so long as reasonable accommodations are provided).

C. The scheduled visit pursuant to A(4) shall be in accordance with the following terms:

(1) Respondent shall accompany Kelley Ann to Michigan, with the arrival time and place to be reasonably agreed upon between the parties so as to allow Petitioner to take possession of the child for the stated visitation period.

(2) Petitioner shall pay the costs of airline tickets for Respondent and Kelley Ann (including the return flight) as well as reasonable expenses of room accommodations and travel for Respondent during said visit.

(3) Petitioner shall return Kelley Ann to Respondent at the end of said visit and either provide cab fare or personal escort to the appropriate Michigan airport.

D. In addition, this order is conditioned upon Petitioner, Edward S. Piggins, posting a corporate surety bond in the sum of Three Thousand ($3,000.00) Dollars, approved by the court, to assure his faithful compliance with this order.

E. Cancellation of any scheduled visitation by Respondent, Christine Piggins Kifer, shall only be permitted for medical reasons verified by a physician in writing to Petitioner. Cancellation of a visit due to illness of the minor child shall require rescheduling for an equal period, as soon as her condition sufficiently improves to allow travel, and over a Thursday through Sunday period selected by Petitioner.

F. Cancellation of any scheduled visitation, for any reason, by the Petitioner, Edward S. Piggins, shall require immediate notice to the Respondent, Christine Piggins Kifer.

G. Respondent shall also be required to pack necessary clothing, personal effects and any medicine required by Kelley Ann during such visitations.

H. Further it is ordered that Petitioner shall have such further reasonable rights to visitation with said minor

child at such times and places as shall be mutually agreed upon between Petitioner and Respondent.

I. This order shall remain in full force and effect until such time as this court determines more liberal visitation policies should be granted in light of the child's age, maturity and attending circumstances.

The father filed exceptions, and on August 20, 1979, the lower court *en banc* adopted the findings of fact as stated by the hearing judge in his opinion, and dismissed the father's exceptions, except that it directed that the father need not post any bond. The father then filed this appeal, which was argued before us on November 11, 1980.

1

As may be observed from a comparison of the visitation order entered by the Michigan court with that entered by the lower court, the lower court retained the schedule and duration of the father's visits with Kelley as specified by the Michigan court, but changed the place of the visits (so that the first three visits had to be in or around Fayette County instead of in Michigan) and the terms of the fourth visit (which could be in Michigan, on condition, however, that the mother accompany Kelley, at the father's expense; whether the father may visit privately with Kelley once the parties arrive in Michigan is not made explicit).

The findings of fact incident to this modification are no more than a history of the case. They recite the parties' marriage, Kelley's birth, and the parties' residence in Michigan. (Findings of Fact Nos. 1–3) They then summarize the course of the father's divorce action, noting the mother's failure to comply with the temporary visitation order entered by the Michigan court. (Findings of Fact Nos. 4–10) In the course of this summary it is noted that "apparently because of [the mother's] dissatisfaction," her Michigan and Pennsylvania counsel sought to withdraw their appearance in the Michigan proceeding; that permission was initially denied; but that after the divorce decree became final, Michigan counsel was permitted to withdraw, although Pennsylvania counsel remained on the record. (Findings of

Fact Nos. 8 & 10) The findings then recite the mother's continued failure to comply with the Michigan court's visitation order, the father's initiation of an action in habeas corpus, and the fact that hearings on the action were held. (Findings of Fact Nos. 11–13) No finding of fact relates to, or in any way explains or justifies, the court's modification of the visitation order entered by the Michigan court. The only explanation of the modification is the following statement at the end of the court's discussion:

Under the instant circumstances, due to the very young age of Kelley Ann and her attachment for Respondent [the mother], we must respectfully modify the visitation provisions of the Michigan Court Order of June 9, 1978. Although we recognize the desirability of visitation by the non-custodial parent free of any restraint by the custodial parent during the visitation period, we do not feel it is in the child's best interests to enforce the travel arrangements under the operational order.[2]

[2] Although the child is presently a year older than at the time of the Michigan Order she is still of a critical stage of development and attachment whereby separation from her mother to travel by airplane to Michigan might very well be traumatic. *See* A. Gesell, et al. The First Five Years of Life, The Preschool Years (1940). Ch. IX, § H on Developmental Detachment; *see also* generally A. Gesell, et al., Infant and Child in the Culture of Today (1974).

Slip op. at 7.

We are unable to approve the lower court's way of proceeding. We have repeatedly emphasized the gravity of a court's responsibility in child custody cases, in which the decision will affect, in the most intimate and decisive fashion, the child's entire life. *Garrity v. Garrity*, 268 Pa.Super. 217, 407 A.2d 1323 (1979); *Valentino v. Valentino*, 259 Pa. Super. 395, 393 A.2d 885 (1978); *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976). So that this responsibility may be proper'y discharged we have required the hearing judge to "engage in a comprehensive review of the record," *Scarlett v. Scarlett*, 257 Pa.Super. 468, 390 A.2d 1331 (1978), and to "file a comprehensive opinion containing its findings of fact and conclusions." *Valentino v. Valentino, supra; Gunter v. Gunter, supra; Commonwealth ex rel. Grillo v. Shuster*, 226 Pa.Super. 229, 312 A.2d 58 (1973). While these

cases typically involve orders awarding custody, the same considerations apply to orders providing for visitation. It is of the highest importance that every effort be made to enable a child to develop and enjoy a wholesome relationship with both parents. *Jon M. W. v. Brenda K.*, 279 Pa.Super. 50, 420 A.2d 738 (1980); *Sipe v. Shaffer*, 263 Pa.Super. 27, 396 A.2d 1389 (1979); *Stapleton v. Dauphin County Child Care Service*, 228 Pa.Super. 371, 324 A.2d 562 (1974).

In the present case, the lower court has made the achievement of a wholesome relationship between Kelley and her father, if not impossible, at least most difficult. This has been done, moreover, without any explanation beyond reference to Kelley's "very young age," her "attachment" to her mother, and the statement, supported only by citation to two texts on child psychology, that "separation [of Kelley] from her mother to travel by airplane to Michigan might very well be traumatic." We find nothing in the record to suggest that airplane travel would be "traumatic" for Kelley. Furthermore, although we take judicial notice that, at least two major airlines do not permit children under the age of five to travel unaccompanied by an adult,[1] under the terms of the lower court's order, Kelley may not fly to Detroit *even if* accompanied by an adult other than her mother or by her own father who could come to Pittsburgh for her and fly back to Detroit with her.

The reproduced record reflects bitterness between the parties, if not hatred. The mother, indeed, petitioned the lower court to terminate entirely the father's relationship with Kelley, and testified that if her request were granted, her new husband would adopt Kelley. (R.R. 225a) One result of the parties' inability, or refusal, to settle their differences has been that Kelley has seen almost nothing of her father; in about two years the father was able to spend only an hour and a half with Kelley. (R.R. 257a) The mother did not testify that it would be "traumatic" for Kelley to fly to Detroit. When asked, "How do you feel about putting her [Kelley] on an airplane and sending her to

1. U.S. Air and Northwest Airlines both have policies requiring children under 5 years old to travel with an adult.

Detroit, Michigan with her father?" she only replied, "I could never do it." (R.R. 59a, 62a), later explaining her answer by saying "... I don't believe I can trust him ... I'm afraid she would not be returned." (R.R. 72a) There is, however, no evidence whatsoever that the father would not return Kelley—as the lower court *en banc* recognized in its order vacating so much of the hearing judge's order as required the father to post bond. And if there had been such evidence, steps might have been taken to ensure return. *See Davidyan v. Davidyan*, 230 Pa.Super. 599, 327 A.2d 145 (1974) (affirming order in divorce decree awarding mother custody in order that she could return home to Scotland, conditional on her posting security with prothonotary as well as submitting evidence from Scotland courts recognizing the retention of court's jurisdiction over both the cause and parties).

In these circumstances it was the responsibility of the lower court to strain every judicial resource to cut through the parties' bitterness; to make plain that their intransigence would not be permitted to interfere with the development of a wholesome relationship between Kelley and each of them; and to devise a visitation order that would enable such development to occur. We are unable to say that the order here satisfies these requirements. So far as we can tell, it heavily favors the mother, without any support in the record for doing so. We are confident that on remand, the lower court, after further testimony, will be able to devise a more even-handed, constructive order, which will enable Kelley to grow up knowing and loving both her parents.

2

Given that the case must be remanded, it is necessary to comment further on the principles of law the lower court must apply, with particular reference to the significance of the Uniform Child Custody Jurisdiction Act, *supra*, adopted as well in Michigan, Mich.Comp.Laws Ann. § 600.651 *et seq.*

■ Under the Uniform Act, a court is competent to make a child custody determination if the state in which the court sits

had been the child's home state within six months before commencement of the proceeding and the child is absent from [the] State because of his removal . . . by a person claiming his custody . . ., and a parent . . . continues to live in [the] State . . .

11 P.S. § 2304(a)(1)(ii).

Accordingly, as the lower court recognized, the Michigan court was competent to enter the visitation order it did enter. The question therefore arises: What effect must be given that visitation order?[2]

2. The mother argues that the Michigan court was not competent to enter its visitation order. (Appellee's Brief at 10) This argument, however, ignores Section 2304 of the Uniform Act. The record discloses that the mother was served with notice of the Michigan proceedings, and chose to be represented by counsel rather than to appear personally at the proceedings, as she was unemployed and therefore could not afford to travel from Pennsylvania to Michigan. (*See* Michigan court order of Jan. 24, 1978, R.R. 283a) Section 2304(c) of the Uniform Act provides that "[p]hysical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody."

On a related point, the lower court stated in its opinion that the Uniform Act did not preclude modification of the visitation order entered by the Michigan court partly because the order was made without the benefit of the mother's testimony and without Kelley's presence. The court acknowledged that the mother was represented by counsel at the Michigan proceedings, but characterized that representation as "short of zealousness." (Slip op. at 6) The court apparently based this characterization on two facts: the mother testified that she was dissatisfied with her counsel in Michigan; and Michigan counsel had petitioned the court for permission to withdraw his appearance in May, 1978, although since the hearing was scheduled for June 5, 1978, and since the mother had no other counsel in Michigan, the court denied the petition. We are unable to find evidence in the record to support the lower court's characterization of Michigan counsel's representation of the mother. The mere fact that counsel petitioned for permission to withdraw does not mean that when his request was denied, counsel failed to represent the mother in a proper manner.

The lower court cited *Brooks v. Brooks*, 20 Or.App. 43, 530 P.2d 547 (1975), for the proposition that an order entered after a custody hearing held without proper representation of both parents may be modified by a court of another state even in the absence of changed circumstances. However, in that case the record revealed that the

The father argues—and argued to the lower court—that the answer to this question is that the lower court was bound to give the visitation order entered by the Michigan court full effect—*i. e.*, the order could not be modified "without proof of changed circumstances." Brief of Appellant at 14. The lower court rejected this argument, and expressed the opinion that the Uniform Act

> does not preclude modification of the Michigan decree solely on a re-examination of the facts gathered at the Michigan proceeding and without any significant change in circumstances ...

Slip op. at 5.

Although the father's argument is somewhat too rigidly stated, it is much closer to an accurate statement of the law than is the lower court's statement, which pays far too little heed to the Michigan court's order.

In support of its statement, the lower court cited *Commonwealth ex rel. Rogers v. Daven*, 298 Pa. 416, 148 A. 524 (1930); *Irizarry Appeal*, 195 Pa.Super. 104, 169 A.2d 307 (1961); and *Reed v. High*, 254 Pa.Super. 367, 385 A.2d 1384 (1978). Examination of these cases will disclose that they do not entitle the lower court to modify the Michigan court's order "solely on [its own] re-examination of the facts" and "without any significant change in circumstances."

In *Commonwealth ex rel. Rogers v. Daven, supra,* our Supreme Court stated that the requirement of proof of changed circumstances before another state's custody order may be modified was "not consistent ... with the principle on which the leading cases rest, *viz.*: that, whenever a court is called upon to award the custody of a child, the guiding star is its welfare. And the court where the matter is pending must decide that grave question on its own best judgment, unfettered, but not necessarily uninfluenced, by a prior adjudication." 298 Pa. at 422, 143 A. at 526. This court, however, has interpreted this statement as stating a qualification to a general rule, that is, that as a general rule

mother neither appeared at the custody proceedings nor was she represented by counsel.

the custody order of another state court should be enforced, but it need not be if circumstances have changed. Thus, in *Commonwealth ex rel. DiPasquale v. DiPasquale*, 162 Pa.Super. 29, 33, 56 A.2d 265 (1948), we said that "while it has generally been held that a judgment as to the custody of children is entitled to full faith and credit in all other states, the judgment is not conclusive if the conditions and circumstances existing at the time of the rendition of the judgment changed. 50 C.J.S. Judgments § 889h(5) p. 487; *Commonwealth ex rel. Rogers v. Daven, supra.*" Similarly, in *Commonwealth ex rel. Graham v. Graham*, 167 Pa.Super. 470, 75 A.2d 614, *rev'd on other grounds*, we held that where there was no evidence of changed circumstances, an Ohio court's award of custody to a mother was entitled to full faith and credit in Pennsylvania. *See also Commonwealth ex rel. Lovell v. Shaw*, 110 Pitts.Leg.J. 477, 111 Pitts.Leg.J. 235, *reversed on other grounds*, 202 Pa.Super. 339, 195 A.2d 878 (1962). *Irizarry Appeal, supra*, the second case cited by the lower court, is to the same effect. There, we said:

> So it appears that the law in Pennsylvania is clear that full faith and credit must be given to the decree of custody of a sister state so far as determines the status of the child at the time it was issued, but if the Pennsylvania Court has jurisdiction, it may, because of the interest of the Commonwealth in the child, and because the welfare of the child is a paramount consideration, and because decrees of custody are temporary in nature and *subject to modification by changing conditions* determine custody on the present facts and may even exercise its independent judgment on the same facts that determined the foreign state's order.
>
> 195 Pa.Super. at 108, 169 A.2d at 309 (citations omitted, emphasis added).

*See also Brocker v. Brocker*, 429 Pa. 513, 241 A.2d 336 (1968), (requiring "substantial and important changed circumstances" before an Ohio court could modify a Pennsylvania custody order.). Finally, it is difficult to say what *Reed v. High, supra*, the third case cited by the lower court, stands for;

the opinion for the court was by two judges; two others concurred (SPAETH, J., filed a concurring opinion in which CERCONE, J., joined); and one dissented (HOFFMAN, J.). The several opinions canvas the law as it was then, and probably the fairest statement is that together they disclose the tension between the importance, on the one hand, of giving full faith and credit to the judgment of a court of another state, and on the other hand, of deciding what is in the best interest of the child; whether or not a prior judgment has been entered.

■ A principal purpose of the Uniform Act is to dissolve, or at least lessen, this tension. All cases decided before its enactment must be read in the light of its provisions, and to the extent that they are inconsistent with these provisions, they can no longer be regarded as the law.

Section 14 of the Uniform Act stated as a general rule that "[t]he courts of this State *shall recognize and enforce* an initial or modification decree of a court of another state which has assumed jurisdiction under statutory provisions substantially in accordance with this act ..." 11 P.S. 2314 (emphasis added). This rule is explained, or elaborated upon, by Section 15, which provides, in subsection (a), that:

If a court of another state has made a custody decree, a court of this State shall not modify that decree unless:

(1) it appears to the court of this State that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this act ...; and

(2) the court of this State has jurisdiction.

11 P.S. § 2315(a)(1).

When these provisions are applied to the present case, it appears that the lower court was not required, without any qualification, to "recognize and enforce" the visitation order entered by the Michigan court. The mother and Kelley had not lived in Michigan for about nine months; the Michigan order was entered on June 9, 1978, and the first hearing before the lower court was on February 27, 1979. Michigan was therefore no longer Kelley's "home state," nor had it

been her home state "within six months before commencement of the proceeding." 11 P.S. § 2304(a)(1). Accordingly, Michigan "[did] not now have jurisdiction," and the lower court, as Kelley's home state, did have jurisdiction.

■ The conclusion that the lower court was not required, without qualification, to recognize and enforce the visitation order entered by the lower court is not, however, dispositive, as the lower court appears to have believed it to be. Subsection (b) of Section 15 of the Uniform Act provides:

If a court of this State is authorized under subsection (a) and section 9 to modify a custody decree of another State it shall give due consideration to the transcript of the record and other documents of all previous proceedings submitted to it in accordance with section 23.

11 P.S. § 2315(b).

The error of the lower court was its failure to abide by these provisions.

In the first place, the lower court did not "give due consideration to the transcript of the record [of the Michigan proceeding]." In a footnote to its opinion, the court states:

Transcripts were requested from the Michigan Court, but due to administrative problems, they were unavailable within a suitable time period. However, the evidence submitted to this court concerning the Michigan proceedings, including the order itself, is sufficient for our purposes.

Slip op. at 6, footnote 1.

We are not persuaded by this explanation. Section 13 of the Uniform Act provides that a custody decree "is conclusive as to all issues of law and fact decided and as to the custody determination made unless and until that determination is modified pursuant to law . . . ." 11 P.S. § 2313. It was therefore imperative that the lower court know what issues the Michigan court had decided, for as to those issues, the parties were bound.

In the second place, and more critical, the lower court did not recognize the effect of section 9 of the Uniform Act, which provides:

## § 2309. Jurisdiction declined by reason of conduct

(a) If the petitioner for an initial decree has wrongfully taken the child from another state or has engaged in conduct intending to benefit his position in a custody hearing conduct the court may decline to exercise jurisdiction if this is just and proper under the circumstances.

(b) Unless required in the interest of the child, the court shall not exercise its jurisdiction to modify a custody decree of another state if the petitioner, without consent of the person entitled to custody, has improperly removed the child from the physical custody of the person entitled to custody or has improperly retained the child after a visit or other temporary relinquishment of physical custody. If the petitioner has violated any other provision of a custody decree of another state the court may decline to exercise its jurisdiction unless the petitioner can show that conditions in the custodial household are physically or emotionally harmful to the child, the burden of proof being on the petitioner requesting the court to take jurisdiction.

(c) In appropriate cases a court dismissing a petition under this section may charge the petitioner with necessary travel and other expenses, including attorneys' fees, incurred by other parties or their witnesses.

In the present case, as the lower court found, *see* Findings of Fact Nos. 6 and 11, the mother "has violated [a] provision of a custody decree of another State," specifically, she has repeatedly refused to obey the visitation order entered by the Michigan court. The lower court was therefore in the position of being able to "decline to exercise its jurisdiction unless the petitioner [the mother][3] can show that conditions

3. It might seem that the father, not the mother, was the "petitioner" before the lower court. In fact, however, both parties were petitioners: the father in his action for habeas corpus, and the mother by virtue of having filed separate petitions for support and involuntary termination of the father's parental rights. *See* lower court's Finding of Fact No. 12. In any event, the applicability of section 9 must be decided as a practical matter and not according to whether a parent is labeled "petitioner" or "respondent." As a practical matter the mother was the petitioner, for her resistance to the father's action for

in the custodial household [the father's house in Michigan, where under the Michigan court's order the visits were to occur] are physically or emotionally harmful to the child, the burden of proof being on the petitioner . . . ." 11 P.S. § 2309(b). Here, the mother did not satisfy this burden; she offered no evidence that it would be physically or emotionally harmful to Kelley to visit her father in Michigan, contenting herself with the statement that she "could never" permit the visits because she was "afraid [Kelley] would not be returned."

In enacting the Uniform Act, the legislature stated that the general purposes of the act included the following:

(1) avoid jurisdictional competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well being;

(2) promote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child;

. . . . .

(4) discourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child;

(5) deter abductions and other unilateral removals of children undertaken to obtain custody awards;

(6) avoid relitigation of custody decisions of other states in this State insofar as feasible;

(7) facilitate the enforcement of custody decrees of other states;

. . . . .

11 P.S. § 2302(a).

By acceding, in effect, to the mother's intransigence, the lower court acted in a manner inconsistent with the achieve-

habeas corpus was functionally equivalent to petitioning the lower court for a modification of the Michigan court order.

ment of these purposes; it rewarded the mother for her disobedience of the Michigan court's order, thereby promoting rather than discouraging continuing controversy, defeating rather than enhancing greater stability in Kelley's family relationships, and encouraging others to act in a similarly disobedient and intransigent manner. *See G. M. P. v. A. P.*, 280 Pa.Super. 372, 421 A.2d 769 (1980).

In a recent Pennsylvania case decided under the Uniform Act, *Commonwealth ex rel. Zaubi v. Zaubi*, 493 Pa. 183, 423 A.2d 333 (1980), (LARSEN, J. joined and filed a concurring opinion, NIX, J. filed a dissenting opinion, joined by FLAHERTY and KAUFFMAN, JJ.), the Supreme Court affirmed an order by which this court reversed an order modifying a Danish court custody decree. The Danish court had awarded custody to the mother. After that award, the father fled Denmark with the children to the United States. The mother filed a writ of habeas corpus with the lower court, seeking enforcement of the Danish decree awarding her custody. The lower court, however, granted custody of the children to the father. We reversed on the basis of section 9 of the Uniform Act. In affirming, the Supreme Court noted its agreement with our opinion that the lower court had erred in failing to defer to the findings of the Danish court, and said:

Section 13 of the Act provides that "a custody decree rendered by a court of this State . . . binds all parties . . . who have submitted to the jurisdiction of the court, and who have been given an opportunity to be heard. As to these parties, the custody decree is conclusive as to all issues of law and fact decided and as to the custody determination made unless and until that determination is modified pursuant to law, including the provisions of this act." 11 P.S. § 2313. Such conclusiveness was obviously intended to extend to custody decrees of other states as well, for it would be unthinkable for the Legislature, in adopting a uniform act, to pronounce the decrees of its own courts res judicata while denying similar effect to the decrees of sister states.

Appellant had proper notice and opportunity to be heard; indeed, a hearing date had been scheduled for his second appeal to the High Court of Denmark at the time appellant fled to the United States with his children. To say, as the dissenting opinion does, that in this situation a Pennsylvania court "may exercise its independent judgment on the same facts that determined the foreign state's order," *Irizarry Appeal*, 195 Pa.Super. 104, 108, 169 A.2d 307, 309, *cert. denied*, 368 U.S. 928 [82 S.Ct. 363, 7 L.Ed.2d 191] (1961), is to ignore the intent of the Legislature in adopting the Act in 1977 and to issue an open invitation from the courts of Pennsylvania to those who, like appellant, would take the law into their own hands. (Slip op. p. 5, footnote omitted).

Although the factual situation presented by *Zaubi* was somewhat different from the situation presented here, the legal principles applicable to both cases are the same, and the error of the lower court in both cases was the same, namely, the failure to give the order of another state the effect required by the Uniform Act.

Reversed and remanded for further proceedings consistent with this opinion. If either party wishes to challenge the order entered upon the conclusion of such proceedings, a new appeal must be filed.

WICKERSHAM, J., files a concurring statement.

WICKERSHAM, Judge, concurring:

Whereas I join and fully concur in the Opinion by my colleague Judge Spaeth, I feel compelled to make one further observation. The lower court's interpretation of the Uniform Child Custody Jurisdiction Act [1] was not only unfairly slanted and interpreted to favor Kelley's mother who happens to be a Pennsylvania resident; but, equally disturbing to me was the concept by the lower court that Kelley's father who happened to be a Michigan resident was some-

1. Act of June 30, 1977, P.L. 29, No. 20, § 1 *et seq.*, 11 P.S. § 2301 *et seq.*

how incompetent to fly into Pennsylvania four times a year and return to his home in Michigan with his daughter Kelley without being accompanied by his former wife. This is an insulting and demeaning infringement upon the rights of the father with not one word of evidence in the record to support it.