J-A06023-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| S.M. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| M.M., JR. | : | |
| | : | |
| Appellant | : | No. 1033 WDA 2020 |

Appeal from the Order Dated August 31, 2020
In the Court of Common Pleas of Washington County Civil Division at
No(s): No. 2018-2373

BEFORE: BENDER, P.J.E., LAZARUS, J., and McCAFFERY, J.

MEMORANDUM BY LAZARUS, J.: **FILED: May 18, 2021**

M.M., Jr. (Father) appeals from the order, entered in the Court of Common Pleas of Washington County, granting S.M. (Mother) primary physical custody and sole legal custody of the parties' three minor children (K.M., age 16; M.M., age 14; and A.M., age 12) (collectively Children), and granting Father partial supervised custody, in a therapeutic setting with a reunification therapist, of M.M. and A.M.[1] After careful review of the record, the transcripts of the two-day

_____

[1] The court's order provides, in part:

1. **That legal custody of [Children] shall be in their Mother, [S.M.]**, subject to the following:

   a. The within sole legal custody award applies to all major decisions relating to the best interests of the Children, including but not limited to, medical, religious, and educational decisions. Thus, they shall be made by Mother, but Father shall be included in meetings and appointments

and have the opportunity to participate, with full consideration of all relevant factors and after complete disclosure of all factors known to each party which are relevant to each decision.

b. Emergency decisions shall be communicated to the non-present party as soon as practicable under the circumstances. Both parties shall have access to all non-privileged medical, counseling, and school records pertaining to the Children.

c. The education, development, health, and well-being of the Children shall at all times be the paramount consideration of the parties.

d. Each party shall be entitled to detailed, non-privileged information directly from any teacher, school, physician, etc., and shall be entitled to obtain copies of all records, reports, or other documents concerning the Children. Further, each party shall have the right to notify the school regarding his or her desire for information.

e. Each party shall be entitled to have copies of any reports or information provided to either party. Each party is directed to provide the other party with copies of any records, reports, or other documents concerning the Children at the custody exchange or as otherwise agreed upon. This includes documents that either party may have direct or indirect access to.

f. Both parties have the right to visit the Children at school or to consult with the child's teacher, physicians, coaches, etc. Further, the within Order shall serve as a release to the Children's school, physicians, childcare providers, psychologists, dentist, psychiatrist or specialist treating the Children, in order that each party receive all non-privileged information and records of the Children directly.

g. If Mother schedules an appointment for the Children, she shall inform Father of same as soon as possible. This notice shall include the date, time, and location of said appointment or session so that Father may attend should he choose to do so. Further, Mother shall list [F]ather on all paperwork regarding the Children including, but not

limited to, emergency contact forms and school/medical registration forms.

h. The parties shall keep each other informed of any behavioral or disciplinary problems encountered by the children whether in or out of school.

i. Day-to-day decisions of a routine nature, including but not limited to routine discipline, bed times, scheduling of homework, and the like, shall be made by the party who has physical custody of the children at the time the decision is to be made. The parties shall make every effort to be consistent between the households.

j. If there is an emergency or serious injury to either the Children or the party caring for the Children, the other party shall be notified immediately via the first available means.

2. **The Children shall reside with Mother,** [] **who shall enjoy primary physical custody**.

3. **Father** [] **shall enjoy partial physical custody of M.M. and A.[M]. as follows**:

a. Supervised in a therapeutic setting with a reunification therapist following the recommendations set forth below in paragraphs 5 and 6.

b. The therapist is to set the schedule of the visits when it is deemed appropriate.

c. Father shall not participate in or be present for any of the children's activities. All contact with the children shall be in the context of reunification therapy unless otherwise agreed upon by the parties or with court approval.

d. Father may have visits upon the agreement of the parties or with court approval.

4. **That Father shall have no contact with K.[M]**.

5. [Mother] is to provide two (2) therapists['] names, within 20 days of this order, who are specially qualified to handle reunification therapy with past suffering such as this case. M.M. and A.[M]. shall participate in the reunification therapy as recommended by the

July 2020 custody trial, the joint stipulations,[2] and the parties' briefs, we

conclude the order is not supported by the evidence.   Where the trial court

_____

> counselor.  [Mother] must also participate as recommended by the
> counselor.
>
> 6. That [Mother] is to provide three (3) therapists['] names for
> Father to complete a risk assessment.  Father is to perform a risk
> assessment as soon as possible.
>
> 7. That K.[M]. is to continue therapy with her individual therapist
> and follow all recommendations by the therapist.  The therapist may
> recommend reunification with Father.
>
> 8. The reunification and risk assessment shall receive all collateral
> information from the parties or their attorneys.
>
> 9. That Father shall be permitted to contact M.M. and A.[M]. via
> written correspondence at the direction of the therapist.

Order, 8/31/20 (emphasis added).

[2] Pursuant to the parties' joint stipulations, the testimony of Peters Township Detective Evan Caruso, Washington County Children and Youth Services (CYS) Supervisor Patricia L. Berdine, and reunification therapist Matthew Tutay, MS, MSW, LSW, was incorporated into the record of the *de novo* custody trial, as well as the following corresponding exhibits:

- Allegheny County Child Advocacy Center Forensic Interview Report/Information to accompany Forensic Interview DVD for K.M., A.M., and M.M.

- Sexual abuse evaluation form for K.M., A.M., and M.M.

- April 9, 2018 CYS correspondence regarding M.M.

- June 20, 2018 CYS correspondence regarding K.M.

- January 25, 2019 correspondence from Matthew Tutay

- January 31, 2019 correspondence from Matthew Tutay

- March 19, 2019 correspondence from Matthew Tutay

determined Father to be fit, available, capable, loving, and willing to participate in daily parenting duties, and where there was no credible evidence that Father has harmed or would harm Children, the court's order is not supported by the record and is contrary to the court's application of the statutory factors of the Child Custody Act. *See* 23 Pa.C.S.A. § 5328(a)(1-16). Accordingly, we reverse the order, in part, and remand with instructions.

The parties are originally from Brandon, Mississippi. They married in 2000, relocated to Pennsylvania in 2015 due to Father's employment,[3] and separated in 2018. Mother filed a complaint in divorce and custody on May 18, 2018. Father filed a cross-complaint for custody on June 21, 2018.

On the night of May 2, 2018, a few weeks before Mother filed her divorce complaint, K.M., who was fourteen at the time, revealed to Mother that Father

---

Joint Stipulations, 6/22/20.

[3] Father testified that he started a residential construction company in 1996, which was successful until 2008. That year, the business started to decline, and the financial stress compelled him to seek a new job as a field engineer at Weatherford International. N.T. Custody Trial, 3/26/20, at 55-57. This position required significant travel, where Father would be stationed on an oil rig for days and sometimes months at a time, working twelve-hour shifts, seven days a week. Describing the travel as "brutal," Father sought a transfer within the company after two and one-half years. *Id*. at 58-59. In December 2014, Father started a new position as a sales representative; this position did not require travel, but it required relocation to Pennsylvania. *Id.* at 60. Father moved to Canonsburg, Pennsylvania in December 2014, and Mother and Children followed in July 2015. *Id.* at 59. In May 2016, Father was laid off from Weatherford. Two months later he obtained employment with C3 Controls, where he is currently employed as western region sales manager. *Id.* at 62. This position requires about one week of travel each month. *Id.*

was getting into bed with her at night, had touched her inappropriately, and that he would watch pornography on his phone.[4]  Mother recommended K.M. talk with her therapist, Ashley McCombs, the next day.  N.T. Custody Trial, 7/21/20 (N.T. II), at 78-79.  K.M. had been in therapy for approximately two years, but she had only started treating with McCombs in April 2018.  N.T. Custody Trial, 7/20/20 (N.T. I), at 227, 238.

At her May 3, 2018 therapy appointment, K.M. revealed the allegations to McCombs.  McCombs reported this information to ChildLine.  *Id.* at 211.  That same day, Mother filed a Protection From Abuse (PFA) action against Father, alleging physical abuse by Father against her, M.M. and A.M., and sexual abuse by Father against K.M.  N.T. II, at 81.

At a subsequent therapy session, K.M. reported to McCombs that Father had raped her on two occasions and threatened her if she revealed what had happened.  N.T. I, at 238.  McCombs believes K.M.'s allegations against Father, *id.* at 211, but she acknowledged that her opinion was not shared by investigative authorities  *Id.* at 227.  ("Q: [T]he police, the detectives, the forensic interviewers, CYS, say they're unfounded; correct?  A: Correct.").

On June 19, 2018, the Washington County District Attorney's Office determined Father would not be charged with any criminal acts.  *See* Letter,

_____

[4] As discussed *infra*, when K.M. was nine years old, she took Mother's phone during the night and Mother found K.M. viewing pornography on the phone.  At that time, Father was away, working on an oil rig.  Mother also found K.M. viewing pornography on her phone and on the computer when she was twelve or thirteen years old.  *See* N.T. II, 7/21/20, at 67, 126-28.

Peters Township Police Department, 6/19/18. The letter specified: "No medical evidence consistent with anal/penile penetration. The alleged victim had an intact hymen and no evidence of trauma." **Id.** The investigation indicated "possible motivation concerning divorce and custody issues" and that Father had passed a polygraph examination. **Id.**; N.T. Custody Hearing, 4/8/19, at 143-44 (Detective Evan Caruso testified there was no physical evidence of sexual assault on K.M. and no medical evidence consistent with anal or vaginal penetration).

Two days later, on June 20, 2018, CYS issued a report concluding the allegations against Father with respect to K.M. were unfounded. **See** Testimony of Supervisor Patricia Berdine, Washington County CYS, N.T. Custody Hearing, 4/8/19, at 146-48.

After the CYS and criminal investigations were closed, Father petitioned the trial court for a custody psychological evaluation, which was granted. The court appointed Dr. Michael Crabtree to conduct the evaluation. Order, 8/8/18. Because the PFA had not yet been dismissed,[5] Father requested the court to allow Dr. Crabtree to supervise and interview Children in the presence of Father. The court granted this request. Order, 9/12/18.

On November 14, 2018, Doctor Crabtree issued his report. Doctor Crabtree interviewed both Mother and Father and observed each parent with Children. He also conducted psychological testing–personality assessment inventory, the parental awareness skills survey, the parental stress index, the parent-child relationship inventory, and the parent perception of child profile.

---

[5] The PFA was dismissed on November 18, 2018.

N.T. II, at 136. Doctor Crabtree included in his report, and in his subsequent testimony, that he was aware of the rape and sexual assault allegations made by K.M., and that he had reviewed the therapy notes from K.M.'s sessions with Dr. Courtney Ramos, K.M.'s therapist prior to McCombs, who noted: "K.M. . . . demonstrates poor self-control. She . . . can act without thinking. It is reported that she can deceive others and break rules to see what will happen." *Id.* at 143.[6] Although unaware during his evaluation, Dr. Crabtree learned

_____

[6] At the hearing before the hearing officer, Dr. Crabtree reviewed Dr. Ramos' notes from her September 16, 2017 session with K.M. Doctor Ramos' notes provided, in part:

> When asked if she has a romantic interest, [K.M.] reported that she's not interested in anyone, is not allowed to date until she is 16. Assessed history of trauma in other areas, physical and sexual abuse. In regards to discipline, she reports that her parents take privileges or things away and sometimes yell. She denied hitting or slapping as a form of punishment. When asked if she had been exposed to inappropriate sexual content other than the pornography she has found on her parents' phone, [K.M.] reported that she has not and stated that the first time she Googled sex was when she was ten years old after hearing her friends talk about it. She reported she got into trouble and did not look at anything until this year. She stated that there were three or more incidents in the last six months when she Googled sexual content after talking about sex with her friends. She reported she knows it was wrong and she is not allowed to be on the computer or phone without supervision.

N.T. Custody Hearing, 4/8/19, at 185. Doctor Crabtree's testimony continued as follows:

> Q: [] Now, given the fact that [K.M.] had been in counseling with [] Dr. Ramos for four months without any word about sexual contact, and, I mean continuously having the father come in, showing her violent pornography. That's the allegation we've heard today. And the two rape episodes. One in February of '18, maybe late January of '18, and then one several years before. Do you have any concerns

_____

about this timeline about how, within two or three weeks with a brand new counsel, this child is making all of these revelations about sexual abuse?

A: Yeah. I do. [] I think it's true that you can't negate the fact that something happened just by rational thinking. So I will say this is not to say something did not happen. On the other hand, when you have a therapist who specializes in working with adolescents, who worked with the child for an extended period of time and intentionally tried to get information for that domain, and [] that you run quickly to the next therapist, it is a curiosity at the least. And I will want to suggest to the [c]ourt, when I called Ms. McCombs, in all honesty, I thought that I might see someone who or hear someone who I thought was beating a drum, and I don't think that's the case with this therapist. I did not get a sense, in my conversation with her, that she was looking for something and brought it out of the child. That's not the sense that I have. So that makes it even more curious to me as to why [] we have a psychologist with five, six years of training after graduating from college, and who is skilled in this area, you know. To come up with nothing then a master level therapist [] gets all of this information. With me saying, that's not that I suspect the therapist was up to no good.

Q: **Okay. So let's cut to the chase here. Do you believe it is appropriate for the younger children to participate in reunification counseling with their father?**

A: **Yes.**

Q: **And do you believe- do you have any opinion as to whether the time has come[,] will soon come[,] when the father should have unsupervised contact with the two younger children?**

A: **Yes. I think there's a time in between the two things you are talking about, the things that should happen, but yes.**

*Id.* at 189-91 (emphasis added). On cross-examination, however, Dr. Crabtree acknowledged that it was possible K.M. had a better connection with McCombs than she did with Dr. Ramos, which could explain K.M.'s failure to divulge these allegations to Dr. Ramos. *Id.* at 194. Additionally, McCombs testified that K.M. "did not feel a therapeutic relationship with the other counselor [] because her dad was able to meet with that counselor, and therefore, she did not feel she

during his direct testimony that Mother's therapist conducted a "joint brain spotting session"[7] with K.M.'s therapist, McCombs. *Id.* at 149-50. With respect

_____

could trust that information would not somehow get back to her dad, and she was fearful of her life." Custody Hearing, 4/8/19, at 217. McCombs also testified that, in her referral to ChildLine with respect to the allegation of rape, "Patient reported Dad then said to her, quote, If you tell anyone about this now or ever, I will kill you, end quote." *Id.* at 207.

[7] In her interview with the hearing officer, K.M. described the "brain spotting" session:

Q: So you told your mom [about the pornography] and then the next day saw your therapist. [] And this was Ms. McCombs that you talked to?

A: Yes.

Q: Okay. Now, who did you tell about the rape first?

A: It was Alyssa. My mom's counselor. Because she specializes in, like, trauma. But [McCombs] was there too.

Q: So you were talking to both of them?

A: Yeah. They did this, like, thing – I don't know.

Q: Okay. So they decided to have a joint session where they both were in there with you? Do you remember why they were both there with you?

A: Because they knew—I knew something else had happened, but I couldn't exactly remember it. So they did this thing to help me, like, clear my head and help me, like, bring it back, I guess. [] I just put headphones on [with calm sounds] and, like cleared my head. And they asked me questions. . . .

Q: So while they were asking you questions, do you remember what they asked you that made you talk about the rape?

A: Well, they would just ask me, like, what happened at night. And it was just kind of from there, I guess. Just – I read what I said,

to the sexual assault claims, Dr. Crabtree stated that commingling of information between therapists confused matters and made it difficult to "determine if the statements made by [K.M.] are, in fact, accurate or not." *Id.* at 151.

Doctor Crabtree concluded in his report that Children had been told negative information about Father by Mother, that such sharing might explain Children's statements against Father in their interviews, and that K.M. may have been influenced by information from Mother's counselor. *Id.* at 156-57. He stated:

> I think this[,] the literature on claims and false claims of sexual abuse by children for caregivers suggests that they're [sic] one motivation [] can be [] responding to what others in that family situation, and what others involved in the investigation implies being negative characteristics of the parent. So I wanted to make sure that the [c]ourt would have the information for its consideration that might suggest that the explanation for the child's statements could have come from that kind of negativity about [F]ather[.]

*Id.* at 157. Doctor Crabtree noted, however, that "if [M]other is acting on the belief that the child's statements are legitimate, then, [] her behavior could not be in the strict sense alienating, it would be protective." *Id.* at 185.

Notably, Dr. Crabtree suggested the trial court not place any weight on Children's testimony, opining that they "[d]o not have the capacity for making a decision about what is in their best interests." *Id.* at 168. Doctor Crabtree

_____

> actually, the other day. Yesterday. It was just questions about what happened at night.

Interview with K.M., 4/30/19, at 36-39.

ultimately recommended shared legal custody and reconciliation counseling with Father and the two younger children. N.T. Custody Hearing, 4/8/19, at 185.

Following Dr. Crabtree's evaluation, on November 27, 2018, the parties entered into an interim consent order, whereby Mother and Father shared legal custody of the two younger children, M.M. and A.M., Mother had primary physical custody of M.M. and A.M., and Father had partial supervised physical custody of M.M. and A.M. The order provided Mother had sole legal custody of K.M. and Father would have no contact with K.M. *See* Interim Consent Order, 11/27/18.

In December 2018, Father, M.M., and A.M. began reunification counseling with Matthew Tutay. After five sessions, Tutay issued his report, recommending Father's exposure to M.M. and A.M. should increase and that Father should be more supported by primary family members. N.T. II, at 156. *See also* Tutay Letter to Washington County Courthouse, 1/25/19 ("Both [A.M. and M.M.] exhibit a level of anger and resentment that appears incongruent to the content of their chief complaints.[8] New interventions will continue to be implemented[;] however, at this juncture, additional support from the primary family members is being recommended, as it has proved to be the most helpful influencer in effective reunification cases. Mr. Tutay believes that increasing [F]ather's exposure to the children in more organic environments demonstrates [F]ather's support and care beyond a therapy mandate. Therefore, the reunification would

---

[8] Our reading of the hearing officer's and the court's interviews with M.M. and A.M. bear this out. *See* Interview with M.M., *supra* at 64.

urge the courts to consider such suggestions in hopes of rebuilding parent-to-child bonds.").

The reunification sessions with Tutay were unproductive and, frankly, heartbreaking. M.M. and A.M. would tear up or fold family memory pictures that Father gave them, or turn away from Father and not speak, or not accept the gifts he would offer. ***See*** Interview with M.M., 4/30/19, at 63 ("[F]ather is usually asking us to say something about our personal life. And I just tell him, "none of your business."); *id*. at 64 ("If anything, [the therapy sessions with Tutay] made it worse."); *id.* at 73 (I don't want to be with my dad. That's just the bottom line."). There was much discussion about "tickling" sessions that Tutay recommended, which M.M. did not like and which clearly backfired. ***See*** *id.* at 61-62.

On April 8, 2019, Hearing Officer Amanda Fisher conducted a custody hearing. On April 30, 2019, the trial court and Hearing Officer Fisher interviewed Children. Pending the Hearing Officer's report and recommendation, Father filed a petition to enforce reunification counseling, which the court granted. The court's order, however, replaced Tutay with Dr. Beverly Ross. ***See*** Order, 5/1/19. Father testified that in all, he and A.M. and M.M. participated in 27 reunification sessions, 17 with Tutay and 10 with Dr. Ross. N.T. I, at 102.

On November 20, 2019, seven months after the hearing, Father filed a petition to determine the status of the Hearing Officer's report and recommendation. That same day, the court entered an order requiring the report and recommendation be filed within seven days. Order, 11/20/19

- 13 -

On December 5, 2019, Hearing Officer Fisher issued a report and recommendation that Mother have sole legal and physical custody of Children and recommending Father have no custody, including therapeutic or supervised custody. *See* Report and Recommendation, 12/5/19. Father timely requested a trial *de novo*.

The court held a two-day custody trial, on July 20-21, 2020, and heard testimony from six witnesses: Father, Mother, Ashley McCombs (K.M.'s therapist), Sara Fox (paternal aunt), Neil Rosenblum, Ph.D. (Psychology Consultant, Washington County CYS), and Michael Crabtree, Ph.D. (court-appointed for custody evaluation). The court also interviewed Children again.

Following trial, the court entered an order on August 31, 2020, granting Mother sole legal and physical custody of Children, and granting Father partial physical custody of M.M. and A.M., "[s]upervised in a therapeutic setting with a reunification therapist" and precluding Father from attendance at any of Children's activities. Custody Order, 8/31/20, *supra* n.1. The order also allowed Father visits "upon the agreement of the parties or with court approval[,]" and ordered that "Father shall have no contact with K.[M]." *Id.*[9]

Father filed this timely appeal. He raises twelve issues for our review:

1. Whether the trial court abused its discretion and committed an error of law in its application of the custody factors at 23 Pa.C.S.A. § 5328?

_____

[9] Currently, K.M. has no relationship with Father; Father has not seen K.M. since May 2018. Father has not seen the two younger children, M.M. and A.M., since December 2019.

2. Whether the trial court erred by denying Father's request for unsupervised custodial periods with [Children]?

3. Whether the trial court erred by awarding Mother sole legal custody of [C]hildren?

4. Whether the trial court erred by determining it was in the best interest of [C]hildren to remain in the primary physical custody of Mother?

5. Whether the trial court abused its discretion and erred as a matter of law by relying upon the preference of [C]hildren, despite the testimony of the court-appointed psychologist that discredited [C]hildren's preferences?

6. Whether the trial court abused its discretion and erred as a matter of law by concluding that [C]hildren had "genuine fear" of Father despite findings by authorities, including police investigations and CYS determinations that all reports of any form of abuse were unfounded?

7. Whether the trial court abused its discretion and erred as a matter of law by failing to consider the testimony of the reunification therapist for A.[M]. and M.M.?

8. Whether the trial court abused its discretion and erred as a matter of law in failing to award Father unsupervised custody where there was no credible evidence that Father is a threat to [C]hildren or Mother?

9. Whether the trial court abused its discretion and erred as a matter of law in its consideration of Factor 2 and 2.1 by finding the factor weighs in favor of Mother, despite no evidence of abuse by Father?

10. Whether the trial court abused its discretion and erred as a matter of law in failing to comply with Pa.R.C.P. 1915.4 to ensure a prompt disposition of the case?

11. Whether the trial court erred as a matter of law when it failed to enter a final custody order for twenty-seven (27) months, from the date of filing of the custody action to the final order being appealed herein?

12. Whether the trial court erred by allowing twenty-seven (27) months to pass and allowed a Master, without appropriate authority, to make a primary physical custody recommendation?

Appellant's Brief, at 4-7.

Our scope and standard of review is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F.*, *III v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

Although we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

*M.A.T. v. G.S.T.*, 989 A.2d 11, 18-19 (Pa. Super. 2010) (en banc) (internal citations omitted). Further,

The parties cannot dictate the amount of weight the trial court places on the evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009).

For ease of disposition, we combine Father's first nine claims. We begin by recognizing that the trial court and counsel have struggled with this custody matter. To characterize it as troubling is an understatement. The allegations are heinous, and the fact that the CYS investigations are unfounded or the district attorney has decided against prosecution does not necessarily mean the allegations are untrue. Nonetheless, unfounded allegations cannot drive the custody decision.

At the custody trial, Father testified that he had a close relationship with all three of his children until February or March of 2018, about two months before Mother filed the PFA against Father on behalf of herself and Children. *See* N.T. I, at 81-82. With respect to the allegations of sexual assault and rape, Father stated, "I still haven't been able to piece out how and why [K.M.] could even come up with these allegations." *Id.* at 86.

Father also testified that in 2010, when K.M. was nine years old, K.M. took Mother's phone and viewed pornography. Mother discovered this. At that time, Father was working on an oil rig. *Id.* at 76-80. Father testified that K.M. viewed pornography again sometime after she started therapy with Courtney Ramos in August 2017, when K.M. was twelve or thirteen. Each time, Mother was the one who discovered K.M. viewing pornography. *Id.* at 78. Mother testified to these events as well. *See* N.T. II, at 67, 126-28. Father testified that he and Mother were concerned about K.M.'s issues with "compulsive eating and telling the truth." N.T. I, *supra* at 79-80.

- 17 -

K.M. was originally in therapy for an eating disorder, and she continued therapy with Ms. Ramos until January 2018. *Id.* at 76-80. Father and Mother were both involved in the testing and therapy. *Id.* They both supported it, and both agreed to terminate it in January 2018 because Mother "didn't think it was doing any good." *Id.* at 78-79. Father testified that K.M. "struggled with telling the truth." *Id.* at 75. This was corroborated by paternal aunt's testimony, *see id.* at 177-78, 187-88, McCombs' testimony (K.M.'s therapist), *see* Custody Hearing, 4/8/19, at 218, and Mother's testimony, *see* N.T. II, *supra* at 67.

Father testified that he believes "[Mother] is deliberately destroying [his] relationship with [his] children." N.T. I, *supra* at 119. He also stated that the damage that has been done is based on a lie. *Id.* at 144. ("I think that [Mother] has orchestrated the kids' hatred for me. And did that lead to her physically telling K.M to go claim that I raped her? I don't know. But did all of that, does it come from [Mother]? Yeah, there's no question.").

Father argues that the trial court abused its discretion and erred as a matter of law in (1) relying upon K.M.'s testimony and failing to "properly consider credible testimony and evidence which contradicts its finding that [C]hildren genuinely fear Father, without any legitimate reasons for such determination[,]" (2) improperly relying upon "the younger children's unreasonable preference, at the expense of any and all other credible evidence and testimony of mental health professionals and investigators[,] and (3) "in applying the custody factors when it made findings and an ultimate conclusion that were inconsistent with its analysis and order, [] thereby failing to enter an

[o]rder that is truly in the [C]hildren's best interest." Appellant's Brief, at 23-24. We agree with Father's arguments.

Section 5328(a) of the Child Custody Act sets forth the best interest factors that the trial court must consider in awarding custody:

§ 5328. Factors to consider when awarding custody

(a) Factors.—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

- 19 -

(9) Which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational, and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a) (1-16).

Here, the trial court addressed each custody factor as follows. Although the court found both parents have indicated that they are willing to accept and work with the court's orders, the court found the first custody factor (which party likely to encourage and permit contact) favored Father inasmuch as he "has not spoken negatively about Mother to the same extent" and Mother has "hesitations with co-parenting" in light of the allegations made. **See** Trial Court Opinion, 9/11/20, at 2.

With respect to the second factor, the court found this favored Mother because although the allegations have been deemed unfounded after

investigation, "there are outstanding concerns that need to be accounted for." *Id.* The court noted "there is a genuine fear of Father." *Id.* at 3. With respect to factor 2.1 (relating to consideration of child abuse and involvement with protective services), the court found "no evidence of this factor" as "all investigations conducted by CYS have been deemed unfounded." *Id.*

The court found the third factor (parental duties performed by each party on behalf of children) favored Mother "because she has been the primary caretaker." *Id.* The court did state, however, "both parties are capable of performing parental duties on behalf of the minor Children, [] and "Father is willing to pick up parental duties if given the opportunity." *Id.*

The court found the fourth factor (need for stability and continuity) favored Mother, as she was the primary caregiver for most of Children's lives. The court noted Children are performing well both academically and socially and that Mother "intends to maintain the status quo with respect to the minor Children's education, family life, and community life." *Id.* at 4.

The court found that the fifth factor (availability of extended family) was neutral, as Children's extended family, on both sides, reside in Mississippi. *Id.* Regarding the sixth factor (sibling relationships), the court found it favored neither party as Children have a strong sibling bond with each other and there was no evidence that the parents do not encourage this. *Id.*

The court found that the seventh factor (well-reasoned preference of the children based on children's maturity and judgment), favored Mother because

Children have all clearly expressed that they wish to remain with Mother. *Id.* at 5.

The court found the eighth factor (attempts to turn children against other parent) favored Father because the evidence showed "Mother has shared negative information about the Father" and "has spoken negatively about Father to all three children." The court added,

> there are concerns about Mother's actions such as (1) Mother allowing the children to read the PFA filed against the Father and (2) Mother having [K.M.] go to the same facility for counseling and allowing commingling between their counselors. D[octor] Crabtree believes these concerns[,] along with Mother's tendency to speak negatively about the Father[,] are used as a way of turning the Children against the Father. However, Dr. Crabtree testified that if Mother actually believes the allegations against the Father, her actions are not unwarranted.

*Id.*

The court analyzed factors nine (which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with children), and ten (which party is more likely to attend to daily physical emotional, developmental, educational and special needs of children), together. The court found Mother and Father both have the ability to attend to the daily needs of Children, but Mother was favored because "she has performed all of the parental duties for the children since they were born[,]" she "continues to be the primary caregiver[,]" and has a good relationship with all of the children. *Id.* at 6. Regarding Father, the court stated:

> Father previously had a normal relationship with all of his children. Although he was unable to perform the daily parental duties for the children due to his work schedule and travel requirements, Father

- 22 -

would spend time and play games with them, in addition to taking them out for breakfast occasionally. Father's relationship with his Children completely changed around February or March of 2018. Now, the Children do not talk to their Father and have rejected any attempt he has made to reunify the family. On the other side, Mother has a good relationship with her children.

*Id.*

The court found factor eleven (proximity of residences) neutral. The parties live 45 minutes apart. *Id.* at 7. Regarding the twelfth factor (availability to care for children or ability to make appropriate child-care arrangements), the court found that it favored neither party. Although Father travels periodically for his job, he works from home and is required to go into his place of work only once per quarter. Mother works part-time for Chik-Fil-A and is able to provide or arrange for transportation and childcare. *Id.*

The thirteenth factor (level of conflict between parties and willingness and ability of parties to cooperate with one another; party's effort to protect child from abuse is not evidence of unwillingness or inability to cooperate with that party), favored neither party. Mother is hesitant to co-parent with Father due to the allegations, but she "has a tendency to try and turn the Children against the Father." *Id.* at 8. The court reasoned that because both parties have expressed a willingness to do as the court orders, despite the high level of conflict, this factor favored neither party.

The court found the fourteenth factor (history of drug or alcohol abuse) was neutral as there was no evidence of a history of drug or alcohol addiction or abuse by either party. *Id.*

The fifteenth factor (mental and physical condition of party) favored neither party, as both Mother and Father "have some degree of mental health issues[,]" but there is no evidence that either parent's mental conditions "would affect their ability to parent the Children." *Id.* at 8-9. Further, neither parent has a physical condition that would affect their parenting ability. *Id.* at 9. Finally, the court noted as factor sixteen (any other relevant factor), that **"[t]his family is in need of specialized intense therapy**." *Id.* (emphasis added).

In sum, the court determined that half of these custody factors were neutral, that factors one and eight favored Father, and that factors four, nine and ten favored Mother. These determinations are supported in the record. *See C.R.F.*, *supra* (where trial court's conclusions are reasonable as shown by record evidence and those conclusions are not result of error of law, appellate court is bound by those conclusions). However, we find the court's determination that factors two, three, and seven favor Mother, unsupported by the evidence.

With respect to factor two (abuse/continued risk of harm), Father attacks the weight the court placed upon the allegations versus Dr. Rosenblum's and Dr. Crabtree's testimony and reports and the results of the CYS and police investigation. After a comprehensive and independent psychological evaluation of Father, including a sexual history, to determine whether Father presented a threat to any child, Dr. Rosenblum made clear that there were "no risk factors present that would lead to the conclusion that [F]ather would abuse the children." N.T. II, at 22-23, 26-28. As the court noted, the allegations against Father were ultimately determined to be unfounded, and Dr. Rosenblum's report

did not raise any red flags with respect to Father's current psychological state. *Id.*[10] Furthermore, the court found factor 2.1 (relating to child abuse/involvement with protective services), neutral, because the allegations were unfounded, yet ignored this finding in analyzing factor two.[11]

_____

[10] It is noteworthy that after K.M.'s allegations and the filing of the PFA, Mother, in a letter to Tutay, stated, "As reunification progresses at the suggestion of Tutay, I am willing for the younger two to go with [Father] for the day[, and u]pon successful reunification, I'm willing for [Father] to have normal alternating holiday arrangements with every other weekend and two weeks in the summer[.]" *See* Defendant's Exhibit H; N.T. Custody Hearing, 4/9/19, at 129-30. Mother acknowledged this at the hearing. *Id.* at 130.

[11] The fact that the forensic and medical reports did not support K.M.'s allegations, and the fact that the district attorney elected not to prosecute, does not necessarily mean K.M.'s allegations are false. There appears, however, that there is much that simply does not add up. Doctor Rosenblum performed a social history of Father, with a more detailed sexual history in light of K.M.'s allegations. He testified:

[Father] was very, for the most part, calm, composed, articulate, certainly, very forthcoming. One of the things that we look for is his willingness to disclose information, both positive and negative, if you will, to be balanced in his reporting. And I found him to be that way. He didn't present himself as the best functioning person or parent. Therein, he was able to discuss weaknesses and areas of concern in his personal functioning, and in his past history, as well as being able to speak positively about personal accomplishments. He didn't hesitate. He didn't seem to be exceptionally defensive. And again, I would have to describe him as being very open and responsive to questions asked of him. And consistent with that, because this is why we do testing, as well, his testing for the most part was equally responsive in nature, without the defensive responding components that one typically sees with these types of evaluations. It's very common for people in custody or dependency -related evaluations, which they aren't doing necessarily for their own benefit, to be defensive and to project as positive, or more virtuous attitude as possible. He did not do that. I thought that there was a fair amount of evidence to suggest that he was being honest and open with us throughout the evaluation process. . . . **[I]f we're looking at risk factors associated with child abuse, impulse control, reckless behavior, poor judgment are associated with individuals who are more likely to commit child abuse of one form or another. Again, he does not have any history of impulse control in areas such as criminal activity, addiction, drug and alcohol abuse, domestic violence. An on the testing, there was no indications of difficulties with anger control or emotion d[y]sregulation**. . . . **And again, I mean, the most salient diagnosis, adjustment disorder with anxiety and depressed mood, I would have been concerned if [Father] didn't display any problems with anxiety or depression. [B]ased on the odyssey he's been through over the past two years, I think the fact that he acknowledges anxiety, that he acknowledges distress, it's consist with a valid indication that this is a person who cares about his children; who is definitely affected by the events of the last two years.**

N.T. II, **supra** at 16-17, 23-24 (emphasis added). Doctor Rosenblum concluded, within a reasonable degree of professional certainty, that there were no factors "that would be consistent with the high probability of his abuse his children." **Id.** at 26.

*(Footnote Continued Next Page)*

In its analysis, the court found that the two younger Children had "genuine fear" of Father, albeit based on questionable examples, ranging from "almost hitting," to "slapping." M.M.'s fear appears to be based on an instance of "roughhousing," where Father slapped M.M. on the thigh.[12] A.M.'s fear seems to be based on her statement that Father "slapped people," and on one occasion where Father was driving by the neighborhood and A.M. saw him. The basis for their fear, as determined by the medical professionals, was tenuous.[13] Yet, the

_____

[12] Mother took M.M. to the doctor, who made a report of abuse to ChildLine. This incident also resulted in an unfounded CYS report. Other than this "slapping" incident, when Father hit M.M. on the leg after M.M. refused to give Father a hug and "kicked him off [of] me," Interview of M.M., 4/30/19, at 58, all three children denied any physical violence in the home while Father was living there. M.M. described an incident where Father "almost hit [K.M.]." **See id.** at 59 ("Q: Did you ever see any violence or anything from [] either parent towards your sisters? A: Not really. He almost hit my sister after we went to the movies." Q: Almost but didn't; correct? A: Yeah. He stopped himself. But still --[.]"). **See also** Interview of K.M., 4/30/19, at 11 ("I've never seen any violence between [my parents."]); Interview of A.M., 4/30/19, at 80-81 (Q: "Did you ever see either of your parents be violent toward each other or towards any of you? Your siblings." A: "I've only seen my dad being mean to my siblings. . . he slapped them. He almost slapped [K.M.]. . . And he would slap us with a belt." Q: "Did your mom ever slap you with a belt?" A: "She had, but she didn't do it as tough as him. She would very lightly do it. He would tell us to pull our pants down and whack us hard." Q: "And he told you to do that?" A: "Once or twice, yeah.").

[13] After reading the hearing officer's interviews with A.M. and M.M., and the trial court's two interviews with them, we agree. There is a clear tenor of "us against him," which is not entirely surprising in light of the fact that M.M. is aware of K.M.'s allegations and A.M. has a "vague idea."

court yielded to the testimony of the two younger children. For these reasons, we agree with Father that this finding is not substantiated by the record.[14]

The court also found factor three (parental duties) favored Mother, despite the court's determination that Father was fit, willing, and capable of performing parental duties. The court acknowledged that "Mother and Father both have the ability to attend to the daily, physical, emotional, developmental, educational, and other needs of the children," but favored Mother simply because she has been the primary caretaker. Trial Court Opinion, *supra* at 6. This acknowledgement favors a neutral determination.

Finally, the court found factor seven (well-reasoned preference of children, based on maturity and judgment), favored Mother. This determination, too, is unsupported in the record. With respect to A.M. and M.M., the court's analysis consisted of the following: "Due to the specific circumstances of this particular case, the preference of the oldest child will be given more weight than the two younger children. Nonetheless, this factor favors Mother because all children prefer to remain with her." Trial Court opinion, *supra* at 5. Doctor Crabtree testified that his conclusion with respect to the "well-reasoned preference of the children, based upon the child's maturity and judgment," was that the two younger children "do not have the capacity for making a decision about what is

---

[14] In issue eight, Father claims the court abused its discretion and erred as a matter of law in failing to award him unsupervised custody where there was no credible evidence that he is a threat. Notwithstanding our agreement with the premise that the record supports the finding that Father is not a threat to Children, the reality is that unsupervised custody simply is not workable at this juncture. It is obvious intensive reunification therapy must be the first step.

in their best interests." *See* N.T. II, at 168. Referring to his report, Dr. Crabtree further indicated, "Even the information that the children might have at their disposal appears to this evaluator to be flawed, and therefore, not to be used by the [c]ourt in its determination of what is in the best interest of the children." *Id.* Again, however, the court credited the younger children's statements and disregarded the medical and expert testimony and reports. We find the court's determination here unsubstantiated as well, and conclude the record supports a neutral finding on this factor.

"[O]ur admittedly circumscribed standard of review does not preclude this Court from finding that a trial court abused its discretion in fashioning a custody order. While prudence dictates that we exercise our authority sparingly, we are not powerless to rectify a manifestly unreasonable custody order." *Cf. J.R.M. v. J.E.A.*, 33 A.3d 647 (Pa. Super. 2011) (imposition of restrictions on Father's periods of partial custody unreasonable in light of evidence of record); *Collins v. Collins*, 897 A.2d 466 (Pa. Super. 2006) (conclusions on which trial court based its award of primary physical custody were unreasonable).

Questionable allegations, ultimately deemed unfounded, have essentially created a presumption against Father. *See* 23 Pa.C.S.A. § 5327(a) ("Between parents. --In any action regarding the custody of the child between the parents of the child, there shall be no presumption that custody should be awarded to a

particular parent.").[15] The court's order may have aligned with Children's stated preferences, but we cannot sanction it on the record before us. We are not convinced that the order was in A.M.'s and M.M.'s best interests. *See C.R.F.*, *supra* at 443 ("Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record."); *R.M.G.*, *supra*. *Cf.* *Rosenberg v. Rosenberg*, 504 A.2d 350, 352 (Pa. Super. 1986) ("A parent will be denied visitation only in those instances where the record shows that the parent is severely mentally or morally deficient so as to constitute a grave threat to the child's welfare.").

We agree with the trial court that no court order will solve this family's problems. Father has fully cooperated with CYS, as well as with a criminal investigation, custody evaluations, and psychological testing. He has done all that can be done in this Commonwealth to establish that he should be a part of Children's lives. That he has not seen his two younger children for over one year is not only disturbing, but, as we read this record, unwarranted.

---

[15] In *Spriggs v. Carson*, 368 A.2d 635 (Pa. 1977), our Supreme Court stated that "courts should inquire into the circumstances and relationships of all the parties involved and reach a determination based solely upon the facts of the case then before the [c]ourt." *Id.* at 640 ("Courts should be wary of deciding matters as sensitive as questions of custody by the invocation of 'presumptions.'"). Similarly, in *Ellerbe v. Hooks*, 416 A.2d 512 (Pa. 1980), the Supreme Court held that, in custody cases between parents, "the burden of proof is shared equally by the contestants and the child's well-being is the focus of consideration." *Id.* at 513.

This family needs intensive reunification therapy, and even that may ultimately prove fruitless. However, on this record, it is too soon to give up on Father and condone an order that virtually terminates Father's parental rights.[16]

We affirm the court's order in part, reverse the court's order in part, and remand for entry of an order: (1) granting the parties shared legal custody with respect to A.M. and M.M.; (2) granting Father partial physical custody of A.M. and M.M. to be supervised in a therapeutic setting with a mutually agreed upon mental health professional/therapist; (3) requiring intensive reunification therapy and counseling with Father and A.M. and M.M., with Mother's participation as specialized services may require, and with the expedited goal of working toward Father's unsupervised custody periods with A.M. and M.M. on a schedule agreed upon by the parties, their therapists, a court-appointed psychologist and the court; and (4) requiring the parties' good faith participation

_____

[16] We find no merit to Father's final three issues pertaining to the court's failure to ensure a prompt disposition, Pa.R.C.P. 1915.4, and allowing the hearing officer to make a primary physical custody recommendation. *See* Pa.R.C.P. 1920.51(a)(2). Due to the COVID-19 shutdown, the trial *de novo* was delayed and rescheduled. Father filed his appeal for a trial *de novo* on December 26, 2019, and a pretrial conference was held on January 28, 2020. The scheduled March 26-27, 2020 trial was continued due to COVID-19, and rescheduled for July 20-21, 2020. Additionally, we have reviewed the trial court's timeline attached to its opinion. Under the circumstances, including Father's admission that several hearings, petitions, and interim orders delayed the case for an extended period, *see* Appellant's Brief, at 58, we find no unreasonable delay. *See* Pa.R.C.P. 1915.4. We note, too, that Father did not object to the hearing officer making a recommendation to the trial court. Father's suggestion that this case be remanded for dismissal of the complaint would be fruitless in these circumstances.

in co-parenting counseling. The reunification therapist shall report the progress to the court to determine an appropriate timeline for increasing Father's custodial periods with M.M. and A.M. With respect to legal and physical custody of K.M., and in all other respects, we affirm the court's order.[17]

Affirmed in part, reversed in part, and remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/18/2021

_____

[17] Though K.M.'s relationship with Father appears to be irreparable, we are hopeful that K.M.'s therapist might ultimately recommend reunification therapy and this relationship may be salvaged. We recognize K.M. is nearing adulthood and that the decision will soon be hers.